**Robert P. SHOOK and Barbara I. Shook, Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 82–7224.

United States Court of Appeals, Eleventh Circuit.

Aug. 29, 1983.

William Bew White, Jr., Hobart A. McWhorter, Jr., Birmingham, Ala., for plaintiffs-appellants.

Caryl P. Privett, Asst. U.S. Atty., Birmingham, Ala., Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Chief App. Sec., Robert A. Bernstein, Mary L. Fahey, Tax Div., Dept. of Justice, Washington, D.C., for defendant-appellee.

Before TJOFLAT and VANCE, Circuit Judges, and MORGAN, Senior Circuit Judge.

VANCE, Circuit Judge:

This is an appeal by taxpayers from a summary judgment for the government for a federal income tax refund suit. We reverse.

The precise question before the court appears simple: Is there a genuine issue of material fact as to what taxpayer Barbara I. Shook settled in exchange for a $200,000 convertible note that she received? The details, however, are much more complicated.

A logical starting point is April 15, 1943 when each of the three principal stockholders of a closed family corporation known as Ingalls Iron Works Company granted that corporation an option to purchase each stockholder's shares in the event of the stockholder's death or retirement from the corporation. A chronicle of some of the later intrafamily disagreements can be gleaned from the opinion of the Alabama Supreme Court in *Ingalls Iron Works Co. v. Ingalls,* 256 Ala. 124, 53 So.2d 847 (1951).

That case resulted from the ouster of the son, Robert I. Ingalls, Jr., from the presidency of the corporation by his father, Robert I. Ingalls, Sr., and the corporation's unsuccessful attempt to exercise its option to purchase the younger Ingalls' stock. The same option is involved in the present case but the principals now are the two daughters of Ingalls, Jr.: taxpayer Barbara Ingalls Shook (Mrs. Shook) and her sister Elesabeth Ingalls Gillet, who at relevant times was Mrs. Sam M. Boykin, Jr.

The taxpayer asserts that it was the design and plan of Ingalls, Sr. and his wife (Mrs. Ingalls) that ultimately the stock in the corporation should be equally divided between their two granddaughters and their descendants. Ingalls, Sr. made a gift of fifty-five shares to Mrs. Gillet shortly after her birth. He never got around to making a like gift to Mrs. Shook. The reason for his failure is unknown but Mrs. Shook suggests that it had something to do with the difficulties between her grandfather and her father.

Mrs. Ingalls, who outlived both her husband and son before dying in 1969 at age eighty-one, included a provision in her will to leave Mrs. Shook an extra fifty-five shares and thereby equalize the holdings of the two granddaughters. At all times until the death of Mrs. Ingalls, however, Mrs. Gillet had fifty-five shares more than Mrs. Shook as a result of the gift from their grandfather.

At the time of her death, Mrs. Ingalls was chairman of the corporation's board of directors. The president was Samuel M. Boykin, Jr. who at that time was married to Mrs. Gillet. Mrs. Ingalls died of a stroke after being in a coma two or three weeks. Five days before her death a quorum of the executive committee of the corporation's board, consisting of Mr. Boykin and two others, purportedly exercised the 1943 option Mrs. Ingalls had granted to the corporation. The effect of such exercise was to perpetuate the fifty-five share disparity in favor of Mr. Boykin's then wife.

The executors of Mrs. Shook's estate were a bank, Mr. Boykin and another member of the corporation's executive committee. Two months after her grandmother's death, Mrs. Shook began prolonged discussions with the executors with respect to her right to the fifty-five shares. A dispute arose and formal demand for the fifty-five shares was made on Mrs. Shook's behalf. Finally on November 13, 1973, a formal settlement agreement was entered into between Mrs. Shook on the one hand and the corporation, the executors, Mrs. Boykin and various officers, directors and trustees on the other. The agreement, a copy of which appears as Appendix 1 to this opinion, is at the center of the present dispute. Under the agreement Mrs. Shook did not get the fifty-five shares but got the corporation's two hundred thousand dollar convertible, subordinated thirty year debenture bearing interest at fifteen percent (Appendix 2).[1]

On their joint return for 1973 the taxpayers treated interest received on the convertible note as income but did not report any portion of the principal amount of the note as taxable income. The Internal Revenue Service allowed the taxpayers to treat $47,-630.00 of the note's principal,[2] which it determined to be the value of the fifty-five shares, as an inheritance. It determined the remaining $152,370 of the principal to be ordinary income. The IRS assessed a deficiency based on taxpayers' income as thus increased. Taxpayers paid the assessment and filed this suit for refund.

The respective contentions of the parties were summarized in the district court's Memorandum of Decision as follows:

2. Plaintiffs Robert P. Shook and Barbara I. Shook here assert that the $200,-000.00 Convertible Note was received by Barbara I. Shook from the Ingalls Company solely in compromise and settlement of Mrs. Shook's claim against the Executors of the Estate of Ellen Gregg Ingalls, deceased, for the 55 shares of Ingalls Company stock bequeathed to Mrs. Shook under the provision of Item 5(D) of the Last Will and Testament of Ellen Gregg Ingalls, deceased, (See Finding of Fact No. 5). On the basis of this assertion plaintiffs argue that no portion of the $200,000.00 Convertible Note is taxable to them as income, relying on the case of *Lyeth v. Hoey,* 305 U.S. 188, 59 S.Ct. 155, 83 L.Ed. 119. That case held that property received by an heir under an agreement compromising and settling his contest of the decedent's will is to be treated in the same manner as an inheritance and thus is not taxable under section 102(a) of the Internal Revenue Code. Plaintiffs argue that the $200,000.00 Convertible Note was received by Barbara I. Shook in lieu of the 55 shares of Ingall [sic] Company stock which she was due to receive under the Ellen Gregg Ingalls Will and therefore no portion of its value may be considered or treated as taxable income to Mrs. Shook.

3. Defendant, conversely, argues that the $200,000.00 Convertible Note was received by Barbara I. Shook not as a result of a will contest, but rather as a result of a settlement of a dispute or disputes between Mrs. Shook, the Ingalls Company and certain of its directors. Defendant alternatively argues that even if this case is considered to be governed by the principle of *Lyeth v. Hoey* only that portion of the $200,000.00 Convertible Note attributable to the value of the 55 shares of Ingalls Company stock which Mrs. Shook claimed under the Ellen Gregg Ingalls Will would be non-taxable with the remainder of the value of the Note being received in exchange for Mrs. Shook's agreement not to seek to enforce her

---

1. She also received formal cancellation of a note and mortgage in a principal amount slightly over one hundred thousand dollars. There seems to be no dispute, however, that during her lifetime Mrs. Ingalls gave Mrs. Shook the house covered by the note and mortgage forgiving any debt otherwise owed by Mrs. Shook on the note and mortgage.

2. This amount is based on valuation of the stock for estate tax purposes in connection with the estate of Mrs. Ingalls. IRS treated the corporation's exercise of the 1943 option to purchase Mrs. Ingalls' stock as void and of no effect.

rights under any other cause of action which she might have against the Ingalls Company, its directors, or against the Executors of the Estate of Ellen Gregg Ingalls, deceased.

■ Faced with cross motions for summary judgment the district court made extensive findings of fact and entered judgment for the government. Although recitation of the undisputed facts supporting summary judgment in the form of "findings of fact" are desirable, *Melancon v. Insurance Co. of North America,* 482 F.2d 1057, 1059 n. 4 (5th Cir.1973), the only required finding is that there is no genuine issue as to any material fact. *Hindes v. United States,* 326 F.2d 150, 152 (5th Cir.), cert. denied, 377 U.S. 908, 84 S.Ct. 1168, 12 L.Ed.2d 178 (1964). If any fact issues exist a trial judge must not make findings but is required to deny the motion and proceed to trial. *Warrior Tombigbee Transportation Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983). Cross motions for summary judgment may be probative of the nonexistence of a factual dispute. *Bricklayers, Masons and Plasterers International Union v. Stuart Plastering Co.,* 512 F.2d 1017, 1023 (5th Cir.1975). Indeed, when both parties proceed on the same legal theory and rely on the same material facts the court is signaled that the case is ripe for summary judgment. Where, as here, however, the parties disagree as to the facts and take inconsistent legal theories the mere filing of cross motions for summary judgment does not warrant the entry of such judgment. *Vetter v. Frosch,* 599 F.2d 630, 632 (5th Cir.1979); *Schlytter v. Baker,* 580 F.2d 848, 849 (5th Cir.1978); *Bricklayers, Masons and Plasterers Union v. Stuart Plastering Co.* at 1023. To justify entry of summary judgment here the government must have borne the heavy burden of demonstrating that there is no dispute as to any material facts with the evidence and all inferences drawn therefrom viewed in the light most favorable to the taxpayers. *Warrior Tombigbee,* 695 F.2d at 1296–97. On review we apply the same standard, *Id.* at 1296; *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026,

1030 (5th Cir.1982), with no presumption favoring the trial court's grant of summary judgment.

On the basis of its findings the district court concluded that (1) the $200,000.00 note was issued in compromise of a number of claims in addition to Mrs. Shook's claim for the fifty-five shares, and (2) taxpayers were estopped from claiming that the fifty-five shares had a value any higher than $47,630.00, the amount for which IRS had already given credit before the computation of the deficiency.

■ In reaching its decision the court noted that IRS had assumed that *Lyeth v. Hoey,* 305 U.S. 188, 59 S.Ct. 155, 83 L.Ed. 119 (1938) applied and it made the same assumption, which we conclude is clearly correct.

On appeal the IRS shifts its position and now argues that *Lyeth v. Hoey* is not applicable. It argues, citing a ninth circuit case, *Commissioner v. Estate of Vease,* 314 F.2d 79 (9th Cir.1963), that where there is no challenge to a will *Lyeth* cannot apply. If not improper the citation is at least inappropriate because it ignores contrary authority by which this court is bound. In *Howard v. Commissioner,* 447 F.2d 152 (5th Cir.1971) the court said:

The Tax Court and the Commissioner on appeal find *Lyeth* inapplicable because there the taxpayers' standing as heirs was not challenged while here petitioner's status as wife has been contested. With deference, we think that such reasoning misses the point of *Lyeth.* In *Lyeth* the Court established the doctrine that in tax matters the characterization of proceeds received in compromise should be determined according to the nature of the claims in settlement of which the proceeds were received. It is artificial to say that any particular aspect of the basis for the claim (e.g. status) must be conceded. Thus in *Ridge Realization Corp. v. C.I.R.,* 1966, 45 T.C. 508 what was compromised was a claim by stockholders against former corporate officers alleging wrongful injury to the corporation. There was no

talismanic "status" involved in that case, yet the Tax Court held that the rule of *Lyeth v. Hoey* applied so that "the character of the amount recovered is determined by the nature of the claims actually pressed and settled in the litigation." *See Raytheon Production Corp. v. C.I.R.,* 1 Cir.1944, 144 F.2d 110.

We conclude that this case is controlled by *Lyeth v. Hoey* and its progeny. The question that determines whether the proceeds received by [taxpayer] are to be treated for tax purposes as property received for release of dower rights is not whether in fact Florida would recognize dower rights in [taxpayer] but rather whether there was a good faith compromise concerning her claim to dower rights.

*Id.* at 155–56. Similarly in *Early v. Commissioner,* 445 F.2d 166 (5th Cir.), *cert. denied,* 404 U.S. 855, 92 S.Ct. 100, 30 L.Ed.2d 96 (1971), we stated the rule as follows:

Whether one relinquishes the right to litigate a suit contesting a will to judgment, as in *Lyeth,* or the claimed right to the possession, use and benefit of stock, as here, we have concluded that so long as the settlement is in substantial measure to resolve an underlying and disputed claim based upon a purported gift, bequest, inheritance or the like, what is received in settlement must be characterized, for tax purposes, by the nature of the underlying and disputed claim resolved. Thus, in circumstances such as those presented by this record, where the rationale of *Lyeth* is implicated but where, in addition, the transaction resembles a sale or exchange of property, we think that *Lyeth* governs unless it may be said that the circumstances surrounding the transaction fairly exclude the possibility that the exchange is in reality a compromise of an underlying and controverted claim such as one of gift, bequest or inheritance.

*Id.* at 170 (footnote omitted).

The government now characterizes the settled dispute as one between Mrs. Shook and the corporation. That position ignores reality. For estate tax purposes the government has treated the option exercise as a nullity. The underlying dispute was whether Mrs. Shook's then brother-in-law, Mr. Boykin, would enjoy effective control of the corporation to the exclusion of Mrs. Shook. The precise dispute was whether Mrs. Shook would or would not receive the crucial fifty-five shares that her grandmother had left her. A majority of the executors of Mrs. Ingalls' estate also comprised a majority of the corporation's executive committee. Under these circumstances we find the government's form over substance contention to be particularly unappealing.

In applying *Lyeth* we address the crucial question: In lieu of what was the debenture given? The conflict between the record and the district court's findings and conclusions is immediately apparent. Mrs. Shook testified on deposition that all she wanted was her fifty-five shares. Her attorney's affidavit contains the following:

Under the 1973 settlement the convertible debenture was issued to Mrs. Shook *solely in settlement and compromise* of her claim for the 55 shares *which represented an inheritance* under the will of Ellen Gregg Ingalls.

(emphasis in original). The affidavit further reflects that the debenture was subsequently converted and that Mrs. Shook received her fifty-five shares by such conversion.

The government did not attempt to contradict this evidence. It contends and the district court held that taxpayers are estopped from claiming any value for the shares in excess of the per share value for Mrs. Ingalls' shares agreed upon audit of her estate tax return.

The district court's reliance on the doctrine of quasi-estoppel rests on the line of cases originating with *Alamo National Bank of San Antonio v. Commissioner,* 95 F.2d 622 (5th Cir.), *cert. denied,* 304 U.S. 577, 58 S.Ct. 1047, 82 L.Ed. 1541 (1938). *See, e.g., Beltzer v. United States,* 495 F.2d 211 (8th Cir.1974); *Continental Oil Co. v. Jones,* 177 F.2d 508 (10th Cir.1949); *Griffith*

*v. United States,* 71–1 U.S. Tax Cas. (CCH) ¶ 9280 (N.D.Tex.1971); *McMillan v. United States,* 64–2 U.S. Tax Cas. (CCH) ¶ 9720 (S.D.W.Va.1964). The doctrine is nothing more than application of a taxpayer's duty of good faith and consistency in tax accounting recognized in *Stearns Co. v. United States,* 291 U.S. 54, 54 S.Ct. 325, 78 L.Ed. 647 (1934). In *McMillan* the three elements necessary to establishing that a duty of consistency exists were summarized as follows:

(1) The taxpayer has made a representation of fact or reported an item for tax purposes in one tax year. (2) The Commissioner of Internal Revenue has acquiesced or relied on that fact for that year. (3) The taxpayer desires to change the representation, previously made, in a later tax year after the first year has been closed by the statute of limitation.

64–2 U.S. Tax Cas. (CCH) ¶ 9720 at 93,838. *Beltzer* involved a typical and easily understandable factual backdrop for application of this doctrine. Beltzer was co-executor of his father's estate. After the father died the executors' evaluation for estate tax purposes of certain stocks in the father's estate resulted in his inherited portion being valued at $59,713.41. In 1966 Beltzer sold the stock for $140,000. For capital gains purposes Beltzer attempted to take the position that his basis should be $118,000 which was the proper value of his inherited stock rather than $59,000. Applying the doctrines of quasi-estoppel and duty of consistency the court rejected Beltzer's argument.

The principle of law applied in the quasi-estoppel cases is perfectly valid. The district court erred, however, in concluding that it has any application in the present case. None of the three *McMillan* elements is present. These taxpayers have made no representations whatever and the Commissioner has not relied on any representation by them. The sole basis for a contrary holding by the district court is a letter from her attorney, Mr. Bew White, to Mrs. Shook suggesting that she agree to the estate tax settlement that the executors had reached with the IRS. Mr. White reported on his

discussion with the attorney for the estate, explained the situation in detail, and stated:

I instructed John Grenier [the estate's attorney] on Thursday, July 13, to tell the executors that you, Barbara, were satisfied with the settlement and that they were, from your standpoint, free to execute the Treasury Department Form 870, which is the settlement document. This, I have stated to them, and they have agreed, is done without prejudice as to your rights to raise the issues previously raised with respect to the administration of your grandmother's estate, and particularly the issue with respect to the 55 shares of Ingalls Iron Works common stock bequeathed to you by your grandmother in her last will and testament. That and all other issues which relate to the estate and to your and your sister's interests therein will have to be ultimately settled.

From this letter alone the trial court found that Mrs. Shook had taken part in the negotiations and settlement with IRS at which an agreed value of $866 per share was placed on all of Mrs. Ingalls' 1407 shares for estate tax purposes. The record does not support the finding. There is nothing in the record to suggest that anyone other than Mrs. Ingalls' executors and their attorney ever had or exercised any authority whatever in handling the resolution of the estate tax liability. The record does not suggest nor is it contended that either Mrs. Shook or her attorney ever had any contact whatever with IRS in connection with Mrs. Ingalls' estate or that the IRS in any way relied on any representation by her. All that the record supports is that the executors' attorney discussed the tax settlement with Mr. White and obtained an expression of Mrs. Shook's approval. There is no indication of any legal necessity for such approval but the wisdom of such a step is apparent. According to Mrs. Shook's deposition her family had been embroiled in intrafamily litigation since she was seven years old. It was obviously prudent for executors to clear their actions with beneficiaries and thereby minimize the risk of a variety of conceivable claims attacking the

discharge of their fiduciary responsibility. None of the cited estoppel cases extend the doctrine to an estate beneficiary for merely indicating approval of the executors' handling over which they have total control and the beneficiary none. There is authority to the contrary. *Compare Ford v. United States,* 149 Ct.Cl. 558, 276 F.2d 17 (1960) (no control) *with Hess v. United States,* 210 Ct.Cl. 483, 537 F.2d 457 (1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977) (control).

Most importantly, however, there is no real inconsistency involved. Mrs. Shook agrees that her basis in the debenture was the same as her basis in the fifty-five shares ($866 × 55 = $47,630). Upon the occurrence of a taxable event her gain would be computed with that basis. Subsequent to the tax year in question she converted the debenture and acquired the fifty-five shares. If she sells the shares her gain or loss will be computed with her basis as indicated.

Taxpayers' future tax liability, however, is not the question now before the court. The sole issue in this case is: in lieu of what was the debenture given? Mrs. Shook says that she received it solely in lieu of the fifty-five shares she inherited from Mrs. Ingalls. We have concluded that she is not estopped from making that contention. The record reveals that her contention is virtually undisputed. The only apparent dispute springs from the language of the agreement itself. She characterizes such language as mere boilerplate, designed to tie down loose ends and not involving anything of value. If so, taxpayers are entitled to judgment as a matter of law. From the present state of the record, however, the issue appears to be a factual one which requires resolution in the district court.

REVERSED and REMANDED.

Appendix 1

"STATE OF ALABAMA)
JEFFERSON COUNTY)

## MUTUAL RELEASE AND BILATERAL COVENANT NOT TO SUE

1. The parties to this Mutual Release and Bilateral Covenant Not to Sue are identified as follows: "The Parties of the First Part" are hereby identified as Barbara I. Shook, individually, and in each of the following capacities: as trustee and as a beneficiary of any trust owning stock of The Ingalls Iron Works Company (the "Company"), of which she is a beneficiary (Ingalls Trust "1", "2", "B", "C", "D", "E", "F", and "G", jointly sometimes hereinafter referred to as "the Ingalls Trusts"), as a beneficiary, legatee or devisee of the Estate of Ellen Gregg Ingalls, deceased, and as a director and/or stockholder of the Company, and as a Trustee of the Elesabeth and Barbara Ingalls Foundation, and Robert P. Shook, individually. "The Parties of the Second Part" are hereby identified specifically as follows:

The Company and each of its directors, other than Barbara I. Shook;

Elesabeth I. Boykin, individually and as trustee and as a beneficiary of Ingalls Trusts and as a director, officer and stockholder of the Company, and as a trustee of the Elesabeth and Barbara Ingalls Foundation;

Sam M. Boykin, Jr., James E. Simpson, and The Exchange Security Bank, jointly and severally, as Executor (or co-executors) under the Last Will and Testament of Ellen Gregg Ingalls, deceased, and The Exchange Security Bank in its capacity as a Trustee of any of the Ingalls Trusts as to which it is a trustee, and in its corporate capacity;

Sam M. Boykin, Jr., individually, and as an Executor under the Last Will and Testament of Ellen Gregg Ingalls, deceased, as trustee of the Elesabeth and Barbara Ingalls Foundation, as director and officer of the Company and its subsidiaries; and

William K. Murray, James E. Simpson and William J. Kearney as director(s) and/or officer(s) of the Company.

2. Barbara I. Shook, by letter dated August 16, 1973, a copy of which has been delivered to each of the Parties of the Second Part, and the receipt of which is

hereby acknowledged, heretofore made a formal demand for the cancellation and revocation of a redemption of 1,407 shares of stock of the Company redeemed pursuant to the terms and conditions of an option dated April 15, 1943, from Ellen Gregg Ingalls, a demand for compliance with the terms and conditions of a settlement agreement dated March 10, 1959, and a demand for certain bequests claimed by her under the Last Will and Testament of Ellen Gregg Ingalls, deceased.

3. The executors of the Estate of Ellen Gregg Ingalls have heretofore contended that Barbara I. Shook is indebted to that estate by reason of a note executed by her to Ellen Gregg Ingalls in the principal amount of $101,588.67 secured by a mortgage on certain real property executed by Barbara I. Shook and Robert P. Shook, which contention is denied by the Parties of the First Part.

4. It is the desire of all parties hereto, and particularly the Parties of the Second Part, in their individual, representative or fiduciary capacities to settle all family, corporate, and Company disputes so that the officers and directors of the Company can devote their full time and attention to the matter of earning a profit and not to the disruptive and unproductive matter of family litigation.

5. The Parties of the First Part (individually and in their several capacities listed above), in consideration of the issuance to Barbara I. Shook of a $200,000.00 convertible subordinated, thirty-year debenture bearing interest at the rate of 15% per annum, and for other good and valuable consideration, the receipt of which is hereby acknowledged, do hereby release, remise and forever discharge the Parties of the Second Part, separately and severally, individually and in any representative or fiduciary capacity, as well as the respective heirs, representatives, successors and assigns of the said Parties of the Second Part, individually and in their representative and fiduciary capacities of and from all manner of actions, causes of actions, suits, proceedings, debts, dues, judgments, contracts, demands, claims and demands, whatever in law or in equity which the Parties of the First Part (or either of them) have against the Parties of the Second Part, or any one of them in any of the various capacities indicated including, but not limited to, any claims by Parties of the First Part against the heirs, personal representatives, successors or assigns of the Parties of the Second Part for or by reason of any matter, cause, action, contract, corporate action, derivative action, expressly including but not limited to the claims made in the said letter of August 16, 1973, addressed to the executors of the Estate of Ellen Gregg Ingalls, deceased, from the beginning of time through the date of these presents.

6. IT IS FURTHER AGREED that the Parties of the Second Part, jointly, individually, and in their several capacities listed above, in consideration of the execution of this Mutual Release and Bilateral Covenant Not to Sue, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, do hereby release, remise and forever discharge the Parties of the First Part, separately and severally, individually and in any representative or fiduciary capacity, as well as the respective heirs, representatives, successors and assigns of the said Parties of the First Part, of and from all manner of actions, causes of actions, suits, proceedings, debts, dues, judgments, contracts, demands, claims, and demands, whatever in law or in equity, which the said Parties of the Second Part (or any of them in any of the various capacities indicated) had, have or may hereafter have against the Parties of the First Part, including their personal representatives, successors or assigns by reason of any matter, cause, mortgage, action, contract, note, corporate or individual action, derivative action, expressly including without limitation the 4% mortgage note of Barbara I. Shook in principal amount of $101,588.67 and $6,301.28 of accrued interest, which mortgage note, with any interest allegedly due thereon, is hereby discharged, cancelled and satisfied by the Executors, and the said Executors warrant that there had been no assignment of such note or mortgage, or of

any interest allegedly due thereunder, or for any other thing whatever from the beginning of time through the date of these presents.

7. The Parties of the First Part and the Parties of the Second Part hereby bilaterally covenant and agree with each other jointly, separately and severally, and in the various capacities indicated above [i.e., individually, as trustee, fiduciary or any representative capacity, as director, officer and executor (or co-executor)], that neither of the parties (of the First Part, or the Second Part) will institute any suit or action at law, in equity, or otherwise against the other in any of the capacities indicated, individually or otherwise; and that neither will institute, prosecute or in any way aid in the institution of prosecution of any claim, demand, action or cause of action for damages, cost, expenses, penalties, fines compensations or equitable relief or derivative relief for or on account of any damage, loss or injury either to person or property or both, whether developed or undeveloped, resulting or to result, known or unknown, which any party hereto had, may have, or which the undersigned parties, their heirs, personal representatives, successors or assigns hereafter shall or may have for or by reason of any matter, action, cause, contract, corporate action, derivative action or anything whatsoever including but not limited to the claims that are set forth or could have been set forth in the said letter of August 16, 1973, addressed to the executors of the Estate of Ellen Gregg Ingalls, deceased, and also including but not limited to the said mortgage and note (with interest thereon) held by the executors of the Estate of Ellen Gregg Ingalls, deceased, (the 4% Mortgage Note of Barbara I. Shook in the principal amount of $101,588.67), which the said executors (identified as Parties of the Second Part), agree to satisfy in full and forever agree to hold harmless Parties of the First Part, or for any other thing whatever from the beginning of time through the date of this covenant, which the Parties hereto hereby settle and discharge forever.

8. Barbara I. Shook and Elesabeth I. Boykin specifically ratify, approve and adopt in all respects the agreements of settlement entered into by the executors of the Estate of Ellen Gregg Ingalls, deceased, and the United States Government concerning the federal estate, gift and income tax returns filed either by Ellen Gregg Ingalls, deceased, individually, or said executors, and expressly agree to a final settlement by consent of the Estate of Ellen Gregg Ingalls.

IN WITNESS WHEREOF, the undersigned parties hereunto set their hands and seals on this the 13th day of November, 1973."

[Executed by all named parties but signatures omitted]

### Appendix 2
### "THE INGALLS IRON WORKS COMPANY PROMISSORY NOTE (SUBORDINATED)
Due November 1st, 2003

$200,000.00                Birmingham, Alabama
                                May 1, 1973

FOR VALUE RECEIVED, the undersigned The Ingalls Iron Works Company, a Delaware corporation (the "Obligor"), promises to pay to the order of Barbara I. Shook, or assigns, (the "Holder") on November 1st, 2003, the principal sum of Two Hundred Thousand and no/100 Dollars ($200,000.00), in lawful money of the United States of America, and to pay interest from the date hereof on the amount of said principal from time to time outstanding at the rate of 15% per annum, payable semi-annually on May 1st and November 1st in each year until payment of the principal sum has been made or duly provided for, both principal and interest shall be payable at the principal office of Exchange Security Bank, Birmingham, Alabama, or at such other place as the Holder of this note may designate in writing, and shall bear interest after their respective maturities until paid at the rate of 15% per annum.

This note may, at the option of the Holder hereof, be converted into fifty-five (55) fully paid and non-assessable shares of voting capital stock of the Obligor (or an equivalent number of shares of voting capi-

tal stock of the Obligor at the time of conversion upon the occurrence of any one of the following events, whichever occurs first: (a) maturity of this note as provided herein; (b) prepayment of this note by the Obligor as provided herein; (c) the death of Elesabeth I Boykin; (d) sale by the Obligor or by Elesabeth I Boykin of shares of common stock of the Obligor to the public under circumstances requiring the registration of said shares under the Securities Act of 1933, or upon a sale of all, or a substantial part of the assets of the Obligor. Provided, however, that in the event Barbara I. Shook should transfer and convey this note, either during her lifetime or upon her death, by will or intestacy, to persons other than the lineal descendants of said Barbara I. Shook, then the conversion privilege provided herein will expire and become void and of no further force and effect.

The Obligor agrees that the fifty-five (55) shares of voting capital common stock to which this note may be converted shall not be decreased in its voting power by means of any stock dividend, stock split, reorganization, recapatialization [sic], or other change in equities of the Obligor so that said fifty-five (55) shares shall not be diluted, directly or indirectly, in its right to a proportionate vote or receipt of dividends or other rights and said fifty-five (55) shares shall have pro rata preemptive rights on any issue of stock, if any, made by the Obligor. The Obligor shall have no right to issue any additional voting securities, or securities convertible into voting securities of the Obligor without the express written consent of the Holder of this note.

In the event of a default in the payment of the principal of or any installment of interest on this note in accordance with the provisions hereof, or in the event of insolvency of the Obligor, a general assignment for the benefit of creditors by the Obligor, the appointment of a receiver for the Obligor or the bankruptcy of the Obligor, then in such event the entire unpaid principal balance of this note, together with all interest which is then accrued and unpaid thereon, shall, at the option of the Holder and without notice or demand, become immediately due and payable for all purposes.

Each party to this note, whether as principal, endorser, guarantor, surety or otherwise, jointly and severally waives demand, presentment, protest, notice of dishonor, and all other requirements necessary to charge or hold the Obligor liable on this note. The Holder shall not by any act, delay, omission, or otherwise be deemed to have waived any of her rights or remedies. In addition, each party to this note agrees that an extension or extensions of the time of payment of this note may be made before, at, or after maturity by agreement with any one or more of the parties hereto without notice to and without releasing the liability of any other party.

The indebtedness evidenced by this note shall be at all times and in all respects wholly subordinate to any and all indebtedness of the Obligor to any and all banks or mortgagees now existing or hereafter incurred, but shall rank on a parity with all other indebtedness of the Obligor whether now owed or hereafter incurred.

The provisions of this note shall be binding upon and inure to the benefit of the respective successors and assigns of the Obligor and the Holder.

The undersigned reserves the right to prepay this note in whole at any time.

If this note is not paid when due under the provisions hereof, the Obligor will pay, in addition to the amounts otherwise owing hereunder, all costs and expenses incurred in the course of collection of such amounts, including a reasonable amount for attorney's fees.

IN WITNESS WHEREOF, the undersigned has caused this note to be executed under its corporate seal and delivered as of the 1st day of May, 1973.

> THE INGALLS IRON WORKS
> COMPANY
> BY /s/ Sam M. Boykin, Jr. (L.S.)
> President

ATTEST:

/s/ E.J. Foley
Secretary"