Bruce P. **WINDESHEIM**, Plaintiff,

v.

**VERIZON NETWORK INTEGRATION CORP., et al., Defendants.**

**No. CIV. AMD 01–1630.**

United States District Court,
D. Maryland.

July 24, 2002.

Alison D. Kohler, Spence Kohler and Christie PA, Towson, MD, for Plaintiff.

Harry T. Jones, Jr., Hogan and Hartson LLP, Washington, DC, Elizabeth F. Harris, Hogan & Hogan, LLP, Baltimore, MD, for Defendants.

## MEMORANDUM

DAVIS, District Judge.

In this diversity action removed from state court, the plaintiff, Bruce P. Windesheim ("Windesheim"), seeks damages of more than $670,000 from defendants Verizon Services Corporation and Verizon Network Integration Corporation. Plaintiff alleges that defendants and/or defendants' predecessors-in-interest failed to pay the full amount of a bonus to which he was entitled in connection with his employment as a systems engineer. Specifically, Windesheim alleges claims for breach of contract, violation of the Maryland Wage Payment and Collection Act, unjust enrichment, and promissory estoppel.

Now pending are the parties' cross-motions for summary judgment. I have given careful attention to the parties' memoranda and exhibits, and a hearing has been held. For the reasons stated on the record during and at the conclusion of the hearing, and as further elaborated below, I shall grant summary judgment in favor of defendants.

### I.

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light

**458**

most favorable to the nonmoving party. *Matsushita Elec. Indust. Co v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987).

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991); *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n. 3 (4th Cir.1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment") (emphasis omitted), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985).

The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. and Indem. Co.*, 627 F.Supp. 170, 172 (D.Md. 1985) (*quoting* Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* 2d § 2720 (2d ed.1993)). *See also Federal Sav. and Loan Ins. Corp. v. Heidrick*, 774 F.Supp. 352, 356 (D.Md.1991). "[C]ross-motions for summary judgment do not automatically empower the court to dispense with the determination whether questions of material fact exist." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir.), *cert. denied*, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consider-

ation." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir.1987). Both motions may be denied. *See Shook v. United States*, 713 F.2d 662, 665 (11th Cir.1983).

"[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil and Gas, Inc. v. Appleman*, 380 F.2d 323, 325 (10th Cir.1967). *See also McKenzie v. Sawyer*, 684 F.2d 62, 68 n. 3 (D.C.Cir.1982) ("neither party waives the right to a full trial on the merits by filing its own motion"). However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook*, 713 F.2d at 665.

## II.

I turn first to Verizon's cross motion for summary judgment. I view the facts, of course, in the light most favorable to Windesheim, the non-movant.

### Background

Windesheim was an employee of Bell Atlantic Network Services, Inc. ("BANSI") from May 1989 until July 2000. BANSI was a wholly-owned subsidiary of Bell Atlantic Corporation. Upon the merger of Bell Atlantic Corporation and GTE to form Verizon Communications, Inc., sometime in the summer of 2000, BANSI changed its name to Verizon Services Corporation, the defendant here. At all times relevant to this case, though formally carried on the books as an employee of BANSI, Windesheim was a systems engineer in the Domestic Telecom Market Segment of Bell Atlantic Corporation. More particularly, he worked in the Bell Atlantic Corporation's

Enterprise Business Group (sometimes hereinafter, "EBG") within Domestic Telecom, one of four "business units" which focused on specific market segments. In addition to EBG, the business units included the Consumer unit, the General Business unit, and the Network Services unit. EBG had responsibility for large businesses and government clients. As a systems engineer, Windesheim provided both pre- and post-sales technical support to customers of two corporate account managers—David Keelan and Dan Flagler.

As relevant to this case, a second wholly-owned subsidiary of Bell Atlantic Corporation was Bell Atlantic Network Integration, Inc. ("BANI"), of which defendant Verizon Network Integration Corporation is the successor. BANI, like BANSI, had a separate corporate existence. BANI, which is referred to by the parties as Data Solutions Group or DSG, like BANSI, was a constituent of the Enterprises Business Group.

In sum, the Enterprise Business Group, located within the Domestic Telecom Segment of Bell Atlantic Corporation, marketed communication and information services to large businesses and to departments and agencies of state and federal government. Sometimes these products and/or services were regulated by state or federal regulators such as the Federal Communications Commission or a state public service commission. It was the regulated/non-regulated dichotomy which once drove—but apparently no longer drives—the particular idiosyncratic operational structures of large telecom companies such as the former Bell Atlantic Corporation. Thus, although Windesheim was formally carried on the books as an employee of BANSI and not on the books as an employee of BANI, both BANSI and BANI employees worked in the Enterprise Business Group of the Domestic Telecom Segment of Bell

Atlantic Corporation. Morever, employees and managers of both BANSI and BANI reported up the corporate chain of command to a single manager of the Enterprise Business Group.

*The Incentive Plan*

Windesheim's compensation arrangement was determined under a massive document called the Sales Incentive Plan ("Incentive Plan"). The Incentive Plan governed compensation for EBG's sales force, listed the base responsibilities for the various positions, and identified the products that plan participants were expected to sell. *Incentive Plan,* at 46. In the rather obtuse and dense language of sales and marketing, these base responsibilities included "revenue generation/implementation support, skill set development, building and maintaining customer relationships, customer satisfaction, opportunity assessment/account planning, education of customers/account team on emerging technologies, and promotion of other Bell Atlantic companies and alliance partners." *Id.* Under the Incentive Plan, Windesheim's base position responsibilities included generating revenue for BANSI, his formal employer, and other Bell Atlantic Corporation entities.

Each plan participant received annual sales objectives or quotas representing his "required performance objective" for a specific period of time. *Id.* at 8. Pursuant to the Incentive Plan, plan participants received a quota for sales of BANSI's products and services and a separate quota for sales of BANI's products and services. The Plan provided:

[e]ach incented [sic] individual is assigned an annual compensation quota for Network Services and an annual compensation quota for DSG services. Each quota is tracked and measured separately. The combined total quota is retired and incentive paid, through sales of Net-

work Products and Services ... and Data Services Group Products and Services.

*Incentive Plan* at 36. Windesheim was thus eligible to receive commissions for sales of BANI products and services. *Windesheim Dep.* at 167; *Deposition of Michael Blundin ("Blundin Dep.")* at 25–27.

The Incentive Plan clearly and unambiguously provides the authority to modify bonus programs. Specifically, the Incentive Plan clearly reserves the right of the Enterprise Business Group to pay or not pay the incentives in its "sole discretion." The Incentive Plan states:

> Bell Atlantic and/or Enterprise Sales reserve the exclusive right with unlimited discretion ... to reduce, modify, recover or withhold incentive pay pursuant to changes in business conditions, individual performance or any other reason management deems appropriate in their sole discretion.

*Incentive Plan* at 5.

The Incentive Plan also contains the following provision:

### 7. BONUS/CONTESTS

> *Selected products and/or groups of products may be eligible for additional bonus incentives and are independent of the Plan.* Each Vice President—Sales or Marketing organization may sponsor and fund contests and promotions during the year. Details for each contest and/or promotion will be announced in advance of the effective date.
>
> The Company reserves the right, in its sole discretion, to amend, change or cancel Bonus Programs and to reduce, modify or withhold Bonus Program Incentives pursuant to changes in business conditions, individual performance or management modification.

*Incentive Plan* at 30 (emphasis added). (As discussed *infra*, Windesheim relies heavily on the italicized language in support of his claims.)

As did all participants in the Incentive Plan, Windesheim signed an acknowledgment upon his receipt of the Incentive Plan which provided as follows in part:

> I have carefully read a copy of the 1999 Bell Atlantic Enterprise Sales Incentive Plan ("Plan") and understand its provisions.... In particular, I understand and agree that my base salary is my agreed upon rate of pay, wage, or required compensation. Any other payment is discretionary. I understand and agree that neither this Plan nor any other document or statement, establishes or constitutes an agreement by Bell Atlantic to pay incentive awards or other compensation.

*Incentive Plan* at 7; *Windesheim Dep.* at 165–66.

### The July 1999 SPIFF

"SPIFF" is a widely used term within the sales industry for a sales incentive or bonus program. It stands for "Sales Promotion Incentive Fund." The gravamen of Windesheim's claims in this case is that defendants failed to pay him the full bonus under a July 1999 SPIFF ("July SPIFF").

The July SPIFF was authorized by the Enterprise Business Group managers and was actually sponsored, with the approval of the Enterprise Business Group, by BANI. *3rd Quarter Bonus for DSG Sales ("July SPIFF"); Dep. of Dennis Dyum ("Dyum Dep.")* at 23. Specifically, BANI undertook to stimulate its sales, increase its market penetration, and to seek new sales opportunities. Although BANI was offering the July SPIFF, ultimately, any bonus compensation earned through the July SPIFF was to be paid through the compensation department of EBG and it is not disputed that EBG had final approval

authority over the terms of the July SPIFF. *Dyum Dep.* at 27–28.

By its terms, the July 1999 SPIFF offered a bonus for "[e]ach sale for above services with contract signed between July 1, 1999 and September 30, 1999." *July SPIFF.* Although the July SPIFF does not define the term sale, the first page of the policies and procedures of the Incentive Plan provides such a definition:

> Sale is defined as any single sales effort documented by an executed contract or Application for Service, including, but not limited, to, the following criteria . . . [s]ingle or multi-product sale for one or more customer applications, locations and/or subsidiaries sold through a single, concerted sales effort. . . .

*Incentive Plan* at 8.

The July SPIFF covered all sales team members, and it did not impose any particular requirements on the level or quantum of effort by a team member. The schedule of bonus awards per sale under the July SPIFF was as follows: (1) Corporate Account Managers: $1000; (2) Systems Engineers: $500; (3) Sales Managers: $200; (4) Systems Managers: $200; and (5) Branch Sales Directors: $100. *Id.* If more than one Systems Engineer were involved in one covered transaction, then the bonus for the Systems Engineers was to be split equally among all Systems Engineers participating. *Id.*

*The CAIS Internet Sale*

The sale out of which the current dispute arises is the September 30, 1999, sale to CAIS Internet ("CAIS"), a leading Internet Service Provider for hotels, apartment buildings, and other multi-dwelling units. CAIS had two accounts with the Enterprise Business Group, one of each of which was serviced by David Keelan's ("Keelan") team and Gladys Villanueva's ("Villanueva") team, respectively. Keelan and Villanueva were EBG Corporate Account Managers. In August 1999, Keelan identified the opportunity to sell dedicated Internet access service to CAIS. Pursuant to the terms of the July SPIFF, Keelan and Villanueva notified BANI of the potential CAIS sale and that it would be a large opportunity. Between September 9 and September 20, 1999, Keelan, Villanueva and a colleague, Eric Solomon ("Solomon"), worked together to consummate the CAIS sale. Ultimately, Solomon received credit approval for CAIS from BANI's credit department allowing CAIS to purchase 1,350 Internet access lines, which were to be installed over a three-year period at a rate of 450 lines per year. On November 16, 1999, DSG publicized the contract it had reached with CAIS Internet, stating that, with yearly service fees and the like, it had a value of up to $42 million.

The *Modification of the July SPIFF*

During the time that Keelan, Villanueva and Solomon were finalizing the CAIS Internet sale, the managers of BANI and the Enterprise Business Group modified the July SPIFF. Specifically, on September 23, 1999, the July SPIFF was extended from September 30, 1999, through December 31, 1999. Also, the following language was added to the elements of the July SPIFF: "bonus payout on sales of multiple lines/services to a single customer will be limited to 5 lines/services per customer." *Modified SPIFF, Pl.'s Mot. for Sum. J.,* ex. 13. The parties vigorously dispute the rationale for this change in the July SPIFF. Other modifications to the July SPIFF included an expansion of the bonus offer to include certain types of contract renewals and upgrades of existing contracts, thus addressing questions that had been raised by the EBG sales force as to whether the July SPIFF applied only to new contracts, or also included renewals and upgrades on existing contracts.

*Payment of the July SPIFF*

It is undisputed that Windesheim did no work whatsoever on the CAIS Internet sale, as his technical know-how was not needed to consummate the transaction. Nor was actual participation required, however, under the terms of the July SPIFF. In January 2000, BANSI paid Windesheim a bonus payment of $2,500 for the CAIS sale, i.e., $500 per line for five lines. Before Windesheim received the bonus payment, he had disputed with his superiors the amount he was due. He believed, as perhaps did others, that he was entitled to received a $500 bonus for each of the 1350 Internet access lines involved in the CAIS transaction.

*CAIS Internet Contract Performance*

As stated *supra*, the CAIS contract required CAIS to install 1350 lines over a three-year period at a rate of 450 lines per year. *CAIS Contract*. CAIS agreed to pay a penalty ranging from $1,050 to $2,100 for each line it failed to install in accordance with the contract. *Id.* By September 30, 2000, however, CAIS had installed just 30 of the 450 lines to which it had committed. Eventually, BANI agreed to waive the $925,050 in accrued penalties and to eliminate the penalty provisions from the contract. As of October 2001, CAIS had only installed six additional lines. CAIS has since filed for bankruptcy.

## III.

Defendants raise a number of issues in support of their motion for summary judgment. As indicated at the hearing, however, I am persuaded that I need not finally determine all of the issues so raised.

 The parties agree that Maryland law is controlling in this case. Longstanding Maryland legal principles recognize that no enforceable contractual obligation is created when an employer offers employees a bonus for doing that which an employee is already required to do pursuant to the terms of the engagement of employment. *Johnson v. Schenley Distillers Corp.*, 181 Md. 31, 28 A.2d 606 (1942) (collecting cases). The rationale for the rule is that there is no consideration—critical to contract formation—to support the employer's promise of additional compensation. Thus, the employer's promise is "illusory" in the sense that it is not legally enforceable in an action for breach of contract.

Windesheim plainly recognizes this principle. In a creative and enviably imaginative bit of lawyering, Windesheim seizes on the fact that while he was formally an employee of BANSI, the July SPIFF was sponsored by BANI, a different corporation within the Bell Atlantic family. From this premise, Windesheim contends that he provided sufficient "consideration" to BANI, and thereby turned the gratuitous promise of a bonus as set forth in the July SPIFF into an enforceable contractual obligation.

I disagree. This argument is not persuasive, ignoring as it does that, as in other areas of the law, legal relationships and outcomes do not, inevitably or even usefully, hinge on formalities of corporate structures. *Cf., e.g., Great Atlantic & Pacific Tea Co. v. Imbraguglio*, 346 Md. 573, 697 A.2d 885, 896–98 (1997) ("statutory employer" doctrine under state workers' compensation regimes); *Franklin v. Gupta*, 81 Md.App. 345, 567 A.2d 524, 535–37 ("borrowed servant" doctrine in medical malpractice), *cert. denied*, 572 A.2d 182 (1990); *Standard Oil Co. v. Anderson*, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909) ("borrowed servant" doctrine under general law of negligence); *Computer Assocs. Intern., Inc. v. N.L.R.B.*, 282 F.3d 849 (D.C.Cir.2002) ("joint employer" doctrine under federal labor law); *Llampallas v. Mini–Circuits, Lab. Inc.*, 163 F.3d 1236,

1244–45 (11th Cir.1998) ("integrated enterprise" doctrine under federal anti-discrimination law). Here, notwithstanding the fact that Windesheim's compensation was paid through a Bell Atlantic subsidiary other than the subsidiary which "sponsored" the July SPIFF, the provisions of the Incentive Plan apply to the July SPIFF as a matter of law. Any doubt about this is dispelled, *inter alia*, by the undisputed fact that the July SPIFF was evaluated by the Enterprise Business Group management and, in particular, its compensation managers, to assure that it could be implemented in harmony with the Incentive Plan.

Thus, for three separate reasons rooted in the plain terms of the Incentive Plan and Maryland law, Windesheim's claims fail. First, the Incentive Plan clearly and unambiguously required that Windesheim provide services on behalf of BANI, a constituent of the Enterprise Business Group, even though he was formally an employee of BANSI, and even if, in fact, as Windesheim contends, his 1999 "quota" for BANI services was "zero." Accordingly, the rule of *Johnson, supra,* is fully applicable, notwithstanding the fact that Windesheim was formally an employee of BANSI.

Second, the Incentive Plan unmistakably reserves to the Business Enterprise Group the "unlimited discretion ... to reduce, modify, recover or withhold incentive pay pursuant to changes in business conditions, individual performance or any other reason management deems appropriate in their sole discretion." Accordingly, by its very terms, as informed by the Incentive Plan, the July SPIFF was not an offer to sales team members to enter into a binding contract. Rather, under the Incentive Plan, the Enterprise Business Group has expressly set forth what *Johnson, supra,* has already adopted as Maryland law.

Windesheim does not, and indeed cannot, suggest a different interpretation of the terms of the Incentive Plan. Instead, Windesheim seeks to escape the parameters of the Incentive Plan by citing the following provision: "Selected products and/or groups of products may be eligible for additional bonus incentives and are independent of the Plan." *Incentive Plan* at 30. Windesheim argues that the use of the phrase "independent of the Plan" "requires a factual conclusion that SPIFFS are not part ... of the employees' base salary or the commission as calculated under the Plan formula. They are a separate payment." *Pl.'s Op.* at 10. Windesheim's argument leaves unstated how such a factual conclusion renders the terms of the Incentive Plan "irrelevant" to additional bonus programs. Contrary to plaintiff's contention, it is clear that such additional bonus programs are indeed "independent" of the Incentive Plan in the sense that they are not funded within the base budget established at the beginning of the year for commissions and incentives. *Blundin Dec.* ¶ 4. The phrase "independent of the Plan" does not and could not mean that additional bonus programs are not subject to the terms of the Incentive Plan—the Incentive Plan *authorizes* such programs in the first instance and expressly reserves EBG's right to modify them.

Finally, the term "sale" is defined in the Incentive Plan as "any single sales effort, documented by an executed contract ... including [a] single or multi-product sale ... sold through a single concerted sales effort." *Incentive Plan* at 8; *see also Black's Law Dictionary* 929 (6th ed.) (1991) (defining sale as "a contract between two parties"). As a matter of law, this definition is imported into the July SPIFF. Notably, Windesheim refers to the transaction at issue as the "CAIS sale," and not the "CAIS sales." Consequently, even if Windesheim or his coworkers thought or hoped the CAIS Internet sale would result in an extraordinary wind-

fall, the plain language of the relevant compensation document would fatally undermine such an interpretation. In the context of Windesheim's claims here, the September modification of the July SPIFF was both unnecessary to avoid the creation of an obligation upon the Enterprise Business Group to pay a windfall (assuming that such was a part of the motivation for the modification) and, in any event, was no more legally enforceable than was the original July SPIFF.

For any one and all of these reasons, Windesheim's claims fail as a matter of law.

### IV.

For the foregoing reasons, and for the reasons stated on the record at the hearing, defendants' cross motion for summary judgment shall be granted, Windesheim's motion denied, and judgment entered for defendants.

### ORDER

In accordance with the foregoing Memorandum, it is this 24th day of July, 2002, by the United States District Court for the District of Maryland, ORDERED

(1) That defendants' motion for summary judgment is GRANTED; and it is further ORDERED

(2) That plaintiff's motion for summary judgment is DENIED; and it is further ORDERED

(3) That JUDGMENT IS ENTERED IN FAVOR OF DEFENDANTS AGAINST PLAINTIFF; and it is further ORDERED

(4) That the Clerk shall CLOSE THIS CASE and TRANSMIT copies of this Order and the foregoing Memorandum to the attorneys of record.