Howard E. JOHANNSSEN, Marvin E. Long and Donna C. Fisher, Plaintiffs,

v.

DISTRICT NO. 1—PACIFIC COAST DISTRICT, MEBA Pension Plan, Defendant.

No. Civ.A. AMD 96–2355.

United States District Court, D. Maryland.

March 29, 2001.

Cyril V. Smith, Zuckerman, Spaeder, Taylor, Goldstein & Better, Baltimore, MD, for plaintiffs.

Christine Williams, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, MD, Marilyn L. Baker, Elizabeth A. Saindon, Richard W. Gibson, Money, Green, Gleason, Baker, Gibson & Saindon, Washington, DC, for defendant.

MEMORANDUM

DAVIS, District Judge.

## I. INTRODUCTION

This case, arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, involves a dispute between three former union employees, plaintiffs Howard E. Johannssen, Marvin E. Long and Donna C. Fisher, and one of the pension plans operated by the union for which they worked. The defendant plan is the District No. 1—Pacific Coast District, Marine Engineers Beneficial Association Pension Plan (hereinafter, "the Plan"). The questions presented are whether one or more of the plaintiffs are entitled to past service credit under the Plan in accordance with the terms of a controversial 1992 Amendment to the Plan Document, the contract specifying the terms of the pension benefits, and if so, what amount of credit each should receive.[1]

Following the completion of the initial round of discovery, the parties filed cross-motions for summary judgment. After considering those motions, I concluded that disputes of material fact with respect to the validity and enforceability of the 1992 Amendment required a trial of those issues. *See* 1997 WL 580827 (D.Md. August 8, 1997). Thereafter, following a three day bench trial, I issued an Order declaring that the 1992 Amendment "became effective upon its adoption." I remanded the case to the Plan Administrator to permit the Plan Administrator to calculate what past service credit, if any, plaintiffs were due. Subsequently, the Plan Administrator issued a series of determination letters dated July 1, 1999, November 19, 1999, and March 7, 2000, concerning the past service credit to which each

plaintiff was entitled under the 1992 Amendment. The Plan Administrator determined that Johannssen was entitled to only 12 years past service credit; he had requested 21 years. He also awarded Long only 12 years past service credit; Long had requested 23 years. Finally, he determined that Fisher was entitled to no past service credit; she had requested eight years.

Now pending are the parties' further cross-motions for summary judgment in respect to the Plan Administrator's determinations. Plaintiffs assert that the Plan Administrator abused his discretion by (1) ceding his decision-making discretion to defense counsel and (2) rendering determinations as to the plaintiffs' entitlement to benefits which disregard the clear language and intent of the 1992 Amendment. Defendant argues that the benefit determinations should be upheld as they were not tainted by a conflict of interest and the Plan Administrator committed no abuse of discretion; rather, argues defendant, the determinations were based upon a reasoned and principled interpretation of the Plan Document, including the 1992 Amendment. All issues have been fully briefed and no additional hearing is required.

In Part II of this Memorandum, I shall set forth my findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) as to the issues regarding the validity and enforceability of the 1992 Amendment. I explain why the plaintiffs have established by a preponderance of evidence that the 1992 Amendment is indeed valid and enforceable. In Part III of this Memorandum, I shall address the pending cross-motions for summary judgment. I explain

---

**1.** Subject matter jurisdiction exists under Section 502(e) of ERISA, 29 U.S.C. § 1132(e). Indisputably, the Plan is an "employee pension plan" governed by ERISA, 29 U.S.C. §§ 1003(a)(3), 1002(2)(A). Plaintiffs are participants in the Plan as defined by 29 U.S.C. § 1002(7).

why, as a matter of law, the Plan Administrator abused his discretion in determining plaintiffs' eligibility for past service credit. For the reasons set forth, I am persuaded that, as a matter of law, plaintiffs are entitled to pension credit for past service as follows: Johannssen, 21 years; Long, 23 years; and Fisher seven and one half years.

## II. THE 1992 AMENDMENT TO THE PLAN DOCUMENT IS VALID AND ENFORCEABLE

In this part of the opinion, I shall set forth my findings of fact and conclusions of law, based on the evidence adduced at trial and the undisputed facts established in the summary judgment record, bearing on the vigorously disputed questions of the validity and enforceability of the 1992 Amendment. In light of the circumstances of the pervasive corruption at the core of the merged union by which the plaintiffs were employed (as discussed below), I expressed a robust skepticism that the 1992 Amendment was valid and enforceable in my earlier ruling denying the cross-motions for summary judgment. Nevertheless, the evidence of record leaves no room to doubt that the 1992 Amendment was duly effected by the entity with the authority to do so and that none of the plaintiffs was culpably involved in the corruption that characterized the formation and administration of their employer, the sponsor of the Plan. Accordingly, for the reasons set forth herein, the Plan erred in refusing to give effect to the 1992 Amendment

when it calculated the pension benefits to which the plaintiffs are entitled.

### A. The Plaintiffs' Employment History

Although the plaintiffs have permissibly joined their claims in this unitary action, each has a unique historical connection to the Plan and to the smorgasbord of unions and collective bargaining organizations through which, and out of which, the claims in this case arise.

#### 1. Howard E. Johannssen

From April 1968 until March 1977, Howard E. Johannssen was employed by the Federal Aviation Administration ("FAA") in New York. Shortly after Johannssen began working for the FAA, in 1969, he was elected as an officer of Local 3341 of the American Federation of Government Employees ("AFGE"), and thereby commenced a virtual lifetime of involvement in union organizing and union administration. He served in this position until December 1975.

In June 1974, Johannssen had begun working to form a new union representing non-air-traffic controller employees of the FAA. These efforts were undertaken on behalf of two unions: the Professional Air Traffic Controllers Organization ("PATCO") and District No. 1—Pacific Coast Division, Marine Engineers' Beneficial Association ("PCD").[2] In 1977, Johannssen resigned from the FAA. He was elected president of the newly-organized Profes-

---

**2.** As will be explained in considerable detail in text, District No. 1—Pacific Coast Division, Marine Engineers' Beneficial Association ("PCD") is the principal entity at the center of this case. As described in this opinion, it was, during the 1980s a well-funded and apparently highly regarded employee collective bargaining organization in the maritime industry. As described *infra*, it merged with a second union and the merged union succeeded to PCD's interests. After approximately

six years and myriad legal proceedings, the merger was rescinded and PCD resumed its pre-merger identity. In 1972, PCD had created the Plan and PCD is, today, the principal sponsor of the Plan. In every meaningful sense of the term, PCD is the real party in interest in this case, which, as required by ERISA, is nominally being prosecuted against the Plan, over which PCD exercises plenary control.

sional Airways Systems Specialists ("PASS"), a union that was sponsored and supported financially by PATCO and PCD. In 1982, PASS became an affiliate of PCD.

Thus, from 1977 to 1994, Johannssen was employed by PASS, as well as other unions associated or affiliated with PCD and its successor, District No. 1—MEBA/NMU ("MEBA/NMU"). Ultimately, Johannssen ascended to the top tier of union management when, in 1991, PASS merged with MEBA/NMU and Johannssen became a vice–president of MEBA/NMU and a member of MEBA/NMU's governing body, the District Executive Committee ("DEC"). Johannssen remained employed by the merged union until September 1994, when he terminated his employment with PASS. Upon terminating his employment with PASS, Johannssen received severance pay in the amount of $108,687.63, pursuant to a written agreement. These payments were completed approximately ten months after Johannssen left PASS.

While Johannssen was still employed by the FAA, i.e., before he left the FAA to organize PASS and to serve as its president, senior PCD officials repeatedly promised him (apparently as an inducement for him to resign from the FAA and undertake full-time union organizing efforts) that he would be awarded pension credit for his service prior to joining PASS, and for his time serving as an employee and officer of PASS, which had no pension plan. Specifically, these promises were made by Jessie Calhoon (then the President of PCD), C. Eugene DeFries (who succeeded Calhoon as President of PCD, and later the first President of PCD's successor, MEBA/NMU) and Michael J. Rock, a senior representative of PATCO acting on behalf of PCD and at the instruction of Calhoon. Rock was, at various times, paid by PCD to work on organizing the PASS union. Johannssen relied on these promises, withdrew his employee contributions to the federal pension plan maintained by the FAA, and thereby forfeited the employers' contributions to that plan. The former Plan Administrator, Lucille Hart, testified that Johannssen had related the same history to her, and that she had no reason to doubt his account.[3]

As mentioned above, from April 1968 through February 1977, while he was employed by the FAA, Johannssen participated in the Civil Service Retirement System ("CSRS"), the general pension system for federal employees. Attendant to his resignation from the FAA to work for PASS, Johannssen withdrew his employee contributions to the CSRS (in the amount of approximately $10,000), and thereby forfeited the employer contributions to that plan. He used these funds to move his household to Washington, D.C., and to pay daily living expenses while he organized, without pay, the new union for the benefit of PATCO and PCD. Johannssen is not currently entitled to any benefits under CSRS for his years of work at the FAA. Nor did he at any time obtain any benefits under CSRS.

From 1977 until approximately 1989, while Johannssen was employed by PASS, he accrued no pension benefits. He expected that the promises made by Calhoon, DeFries and Rock would be honored, and that he would receive pension credit for these years of employment. In May

---

**3.** Johannssen and Long do not contend that the early (and repeated) promises by PCD officials to provide pension coverage to Johannssen and Long were legally enforceable promises binding on the union or on defendant. Rather, the promises, which I find were made as described above, provide significant explanatory background as to the precision with which the 1992 Amendment was drafted and, in full context, the urgency with which it was approved by the DEC. *See infra* pp. 490–93.

1989, 12 years after he began his work for PCD, Johannssen became a participant in the Plan. At that time, however, no provision was made by the union to award past service credit to Johannssen.

2. Marvin E. Long

Marvin E. Long was employed by the FAA from March 1967 to 1977 as an air traffic controller. In 1977, he resigned from the FAA to work full-time as an organizer for PATCO. From January 1977 through December 1983, Long was employed by PATCO as a union organizer and he helped organize PASS and two other collective bargaining organizations: the National Association of Flight Standards Employees (which later merged with PASS) and the Professional Aeronautical Center Employees (which later became affiliated with PATCO). All of these efforts were for the benefit of PCD, which sponsored these organizing efforts. From August 1981 through March 1983, Long's work at PATCO was unpaid because the union was on strike.

After PATCO's strike and bankruptcy, from 1983 through 1994, Long worked full-time for PASS and served as its vice president from 1991 until 1994. In 1994, Long terminated his employment with PASS and received severance pay in the amount of $43,012.72, pursuant to a written agreement. These payments were completed approximately seven months after Long left PASS.

Before Long left the FAA to work full time as an organizer, he was promised that he would receive pension credit from PCD for his past years of service with the FAA. Long relied on these promises, as did Johannssen, and he "cashed out" his employee contributions to the CSRS pension plan when he left his employment at the FAA. He spent these benefits on his move to Washington, D.C., and his organizing work for the benefit of PATCO and PCD. As a result, he forfeited the employer's contributions to the CSRS plan made on his behalf and he is not entitled to any benefits under the CSRS. Calhoon and Rock also promised Long that he would receive pension credit for his years of service with PATCO and PASS during which he accrued no pension credits or benefits.

While Long was employed by PATCO, he was a participant in the defendant Plan and accrued approximately four years of service. But once PATCO went on strike and, eventually, went into bankruptcy, Long lost the service credit he had accrued because he had not yet vested in the Plan. (At the time, the Plan required ten years of service for vesting; presently it requires only five years.)

From 1983 through 1991, the majority of the time Long was employed by PASS, PASS employees did not generally participate in a pension plan and Long relied on the promises of Calhoon, DeFries and Rock that he would receive pension credit for his years of employment with PASS and PATCO. Long resumed his participation in the Plan in 1991.

3. Donna C. Fisher

From 1971 to 1977, Donna C. Fisher was employed by the Boeing Company, and from 1977 to 1980, she was employed by Boeing Services International, a subsidiary of the Boeing Company. Boeing and Boeing Services were both "contracted employers" of the Florida Association of Professional Employees ("FAPE"). Beginning in 1973 and continuing until 1980, Fisher served as FAPE's Recording Secretary and later as its president. From 1973 through 1981, FAPE was affiliated with, and a subordinate body of, PCD, and FAPE was also a subordinate body of the Professional Office and Industrial Division ("POID"). In 1982, FAPE merged into PCD.

Fisher was not a participant in any pension plan during her employment at the Boeing Company or Boeing Services International. From 1980 to date, Fisher has been an employee of PCD or MEBA/NMU, or their subsidiaries and affiliates, and a participant in the Plan. Fisher is not currently participating in or eligible for participation in any pension plan other than the Plan.

After beginning her employment with PCD. Fisher sought pension credit for her eight years of prior service as an officer of FAPE. Her superior, Walter Browne, at one time proposed that Fisher "buy" part of the cost of her past service credit by accepting smaller increases in her salary as an employee of a PCD affiliate, the Federation of Public Employees ("FOPE").

On May 20, 1986, Browne wrote to DeFries and told him that perhaps Fisher's past service credits could be partly funded in a way "which would affect future salary adjustments" for Fisher as a FOPE employee. At the same time, Browne told Fisher that she was going to receive a weekly salary increase only half as large as other FOPE employees, and that this would be offered to PCD as a way of paying part of the cost of her past service credits. The lower salary paid to Fisher every week was never corrected.

B. The Substantive and Procedural History of the Plan and the 1992 Amendment to the Plan Document

The Plan is a pension plan created on January 1, 1972, for the benefit of the employees of PCD, through a contract between PCD and the John Hancock Mutual Life Insurance Company ("John Hancock"). The Plan is governed by Group Annuity Contract No. 1623 issued by John Hancock (the "Plan Document" or the "Contract").

As ERISA requires, the Plan Document includes a procedure for amending the Plan. Article I, Section 20, entitled "Amendment of Plan," at all relevant times provided:

The Employer shall have the right to amend the Plan in any respect, at any time by an instrument in writing, duly executed by the Employer, provided, however, no such amendment shall have any retroactive effect which would reduce a Participant's Accrued Benefit or Vested Benefit as of the date immediately prior to such amendment or otherwise affect benefits already purchased or established for a Participant or other payee except as may be required by applicable provisions of the Code or ERISA or the rules and regulations thereunder.

In October 1992—when the amendment at issue was adopted—the "Employer" under the Plan was defined as: "District No. 1—MEBA/NMU and its affiliated organizations listed below." The organizations listed were: Professional Air Traffic Controllers Association ("PATCO"); Joint Marine Congress Benefit Plan; Radio Officers Union, Medical Benefits Plan, MEBA; MEBAR Realty Holding Trust; Radio Officers Union District No. 3, MEBA; ROU Maritime Electronic Traffic School; and the National Air Traffic Controllers Association. Significantly, over the history of the Plan Document, none of the entities identified in it (besides PCD and, later, PCD's successor, MEBA/NMU) ever played a role in amending, modifying or administering the Plan.

Another provision of the Plan Document, Article III, Section 8, entitled "Modification of Contract," specifies that the Contract, which is the Plan Document, "may be modified at any time by written agreement between the John Hancock and the Contract Holder." The term, "Contract Holder" is nowhere defined in the Plan

Document; however, the term "Contract Holder" is used interchangeably with the term "The Employer," which is defined in the Plan Document to be "District No. 1—MEBA/NMU and its affiliated organizations listed below." "Contract Holder" is often used when the term "any Employer" appears in the same paragraph, and appears to be a linguistic device for avoiding confusion between "The Employer," which includes many employers as defined in the Plan Document, and "any Employer," meaning any one of the many employers included in the term, "The Employer." Thus, as of 1992, when the subject Amendment was passed, the "Contract Holder" of the Plan Document was "District No. 1—MEBA/NMU and its affiliated organizations listed below." The provision for modification of the Contract also specifies:

> No modification shall affect the amount or terms of any benefits already purchased for a Participant or other payee prior to the effective date of the modification without his consent, unless such modification is for the purpose of conforming this Contract to the requirements of Section 401 of the Internal Revenue Code of 1986 or acts amending such Section, or the requirements of ERISA.

Day-to-day responsibility for the Plan's operations from 1986 until 1996 fell to Lucille Hart, the then Plan Administrator. She, in turn, reported to the president of PCD, and after the 1987 merger between PCD and the National Maritime Union (discussed in detail below), to the president of MEBA/NMU.

The Plan lacked any genuine provisions for the appeal of a denial of benefits. Hart was responsible for initial decisions and—because the Plan had no trustees—for appeals as well. This "appeal" procedure was used only three times in the history of the Plan: in connection with claims presented by Johannssen, Long and Fisher. It had practical use only if a participant had new facts or law to bring to Hart's attention.

In 1987, PCD and the National Maritime Union ("NMU") merged and the new union became known as "District No. 1—MEBA/NMU" (generally referred to throughout this opinion as "MEBA/NMU"). It later came to light that the merger was the product of corrupt practices and blatant violations of federal law. The merger was rescinded after six years. In any event, after the merger and for the six years during which the merged entity maintained its legal existence, all of the extant assets and liabilities of PCD and NMU were to "be held in the name of [MEBA/NMU]." Plaintiffs' Summ.J.Memo.Ex. 15, at 3 (Agreement of Merger between PCD and NMU).

As mentioned earlier, a new body called the District Executive Committee ("the DEC") was created to govern the new entity, and the DEC "assume[d] responsibility for all matters of whatever nature whatsoever pending before" each of the two unions that merged. *Id.* at 4. To avoid creating collective bargaining units containing both supervisory and nonsupervisory employees, the merger documents also created two divisions of MEBA/NMU, known as the Licensed Division and the Unlicensed Division. The 1991 Constitution of MEBA/NMU provided that the Divisions would be governed by the DEC and subordinate to it. Plaintiffs' Summ. J.Memo.Ex. 16, Art. III (1991 Constitution of MEBA/NMU). As specified in the Constitution for MEBA/NMU, responsibility for collective bargaining, including appointing trustees to employee pension plans, remained with each Division. *Id.* at Art. IV; *see Licensed Div. Dist. No. 1 MEBA/NMU, AFL–CIO v. Defries,* 943 F.2d 474, 480 (4th Cir.1991), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d

137 (1992).[4] However, the Constitution specified that the collective bargaining agreements would be considered the "property" of MEBA/NMU, not the individual Divisions.

The first president of MEBA/NMU was C. Eugene DeFries, who had served previously as President of PCD. In 1992, DeFries resigned and Alexander Cullison became president. Cullison served as president of MEBA/NMU until June 4, 1993, when the merged union dissolved and split into its constituent parts pursuant to a document entitled "Interim Agreement for Settlement of Disputes Between District No. 1, MEBA/NMU and District No. 1—PCD, MEBA."[5]

After the 1987 merger, MEBA/NMU became the "Employer" under the Plan and remained the Employer until June 4, 1993, when the merger was rescinded. The definition of Employer in the Plan Document was changed from "PCD" to "MEBA/NMU" as a result of the merger, and MEBA/NMU (and specifically the DEC), then enjoyed all the powers (including the power to amend the Plan) which PCD had held before the merger.

**4.** The litigation described in *Licensed Division Dist. No. 1 MEBA/NMU, AFL–CIO v. DeFries*, 943 F.2d 474, 481 (4th Cir.1991), involved disputes over the control of employee benefit plans other than the pension plan which is the subject of the case at bar.

**5.** For reasons which have never been made clear to this judge, the multitude of lawsuits, National Labor Relations Board proceedings, and other adversarial proceedings, fomented by the corrupt practices which resulted in the merged union, failed to achieve a clear and unambiguous restoration of the *status quo ante*. This is true despite the prolonged involvement of several federal judges who presided over the various legal actions which the record shows were pending from time-to-time.

To a very large extent, the case at bar is simply part of the second or third generation

The DEC exercised its power to amend the Plan on at least two occasions in addition to the 1992 Amendment at issue here. Immediately after the merger, MEBA/NMU was required to address the pension status of former NMU employees, who had previously been covered by a variety of pension plans associated with the NMU. Because those NMU plans would no longer provide pension credit after the merger, the DEC of MEBA/NMU voted (in a resolution dated December 14, 1988) to place many of those employees in the Plan. The DEC also voted to amend the Plan's vesting and participation rules so that past service for the NMU would be recognized by the Plan going forward. Hart recognized these changes as effective to change the terms of the Plan.

In a second case, upon the request of the president of MEBA/NMU (DeFries), the DEC added a new participating employer, the National Air Traffic Controllers Association ("NATCA"), to the Plan. Hart promptly recognized the decision of the DEC to add NATCA's employees to the Plan as valid, binding and effective.

of litigation which was spawned by the corrupt events mentioned in text. What has been made clear to me, however, is that those who are presently in control of the restored union (and thus, of the defendant Plan, *see supra* n. 2) regard the plaintiffs' evident loyalty to the former union leaders as disqualifying them from any consideration for remedial pension benefits, let alone increased pension benefits, despite the unassailable efforts each of the plaintiffs devoted to the union movement in general, and to both the pre- and post-merger PCD, over the years. *See infra* pp. 505–07 (discussion of current Plan Administrator's adversarial attitude towards plaintiffs). In any event, as defendant concedes, there is not a scintilla of evidence in the record that any of the plaintiffs knew of, or had any involvement in, the corrupt practices which form the foundation of the events from 1987 through 1993, during the existence of the merged union.

Moreover, documents prepared by the Plan itself, following the merger, confirm MEBA/NMU's authority over the Plan. For example, the Plan was required by federal law to file an "Annual Report/Return of Employee Benefit Plan" (also known as a "Form 5500") every year with the Internal Revenue Service, the Department of Labor and the federal Pension Benefit Guaranty Corporation. The Form 5500 contains a box requiring every pension plan to identify the "plan sponsor," which is the person or entity which establishes or maintains the plan. *See* 29 U.S.C. § 1002(16)(B). Beginning in 1989, the Plan's Form 5500s identified the plan sponsor as "District No. 1—MEBA/NMU (AFL—CIO)." This was true of the Form 5500s filed in 1989, 1990, 1991 and 1992. Each Form 5500 was signed by Hart. Hart signed one such Form 5500 on October 7, 1992 (less than two weeks before the 1992 Amendment was effected), which identified "MEBA/NMU" as the plan sponsor.

Nine months later, on July 26, 1993 (and well after the rescission of the merger), the Plan filed a Form 5558 with the IRS, requesting an extension of time to file its Form 5500 that year, covering calendar year 1992. The Form 5558 required the Plan to identify the Plan Sponsor. Under penalty of perjury, the Plan's controller, Mark Siegel, identified the plan sponsor on the form as "District No. 1, MEBA/NMU (AFL—CIO)." When asked at his deposition (admitted at trial) whether this was an "accurate statement when you filled out this form," Siegel replied: "I believe it was, yes." Plaintiff's Summ.J.Memo.Ex. 7, at 26.

Although the Plan contends that in October 1993 it filed—for the 1992 Plan Year—a Form 5500 identifying "District No. 1—PCD, MEBA" as the sponsor, there is no record of this Form 5500 being filed or received by the Department of Labor. The Department of Labor does,

however, have a facsimile copy of its records which indicates that MEBA/NMU was the Plan sponsor in 1992. In addition to the above reports, the Plan was required to send summary annual reports to every participant. On December 1, 1992, the Plan sent such a report to Fisher, which it addressed to "Employees of District No. 1—MEBA/NMU and its Participating Sponsor Employers."

In October 1992, the DEC of MEBA/NMU voted to amend the Plan's provisions governing "service credit" (the number of years which count in determining pensions payable). This was the defining event which gives rise to the present litigation. Specifically, the DEC passed a resolution amending the Plan to grant pension credits to Plan participants for past service with affiliated unions and other named entities. The resolution, drafted and circulated to all the members of the DEC in late September 1992, provided:

BE IT RESOLVED, that District No. 1—MEBA/NMU take all necessary steps to amend Article I, Section I, Paragraph (1) of Group Annuity Contract No. 1623 GAC issued by the JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY covering certain employees of the District and its affiliated and related organizations as follows:

Article I, Section I, Paragraph (1) is amended to add a new subparagraph to read as follows:

Notwithstanding anything to the contrary, Service shall be granted to all Participants for each year of Service as an employee or officer of (i) Professional Airways Systems Specialists (PASS); (ii) Professional Air Traffic Controllers Organization (PATCO), or its subordinate bodies; (iii) Professional Office and Industrial Division (POID) or its subordinate bodies; (iv) service with a contracted employer of District No. 1—

MEBA/NMU or one of its affiliates; (v) and the American Federation of Government Employees (AFGE) or its subordinate bodies; provided that the participant has not received service credit with respect to any other pension plan in which the participant is entitled to an accrued benefit.

Plaintiffs' Summ.J.Memo.Ex. 30 (the 1992 Amendment).

The purpose of the 1992 Amendment was to provide pension benefits and service credits to plaintiffs, and apparently, to an employee named Abby Bernstein, who had performed organizing and related activities on behalf of the union, but who had been unable to maintain or accrue pension benefits. Michael Derby, the General Counsel and assistant to the president of MEBA/NMU, who assisted in drafting the proviso to the 1992 Amendment, and upon whom the Plan Administrator relied in interpreting it, made several contemporaneous statements before and shortly after the adoption of the Amendment, which made it clear that the Amendment's purpose was to grant 21 years of credit to Johannssen, 23 years to Long, and eight years to Fisher.

The resolution was transmitted via facsimile to all DEC members for their review and approval. Johannssen (then a member of the DEC) abstained from voting on the resolution; the other seven members of the DEC unanimously approved it by facsimile transmission. Then, on October 20, 1992, at a DEC meeting, the resolution was confirmed and ratified. The Amendment was effective as of that date.[6]

After the resolution was adopted, Cullison (then the MEBA/NMU president) informed both John Hancock and Hart, by letter dated December 1, 1992, that

MEBA/NMU had voted to amend the Plan to grant prior service credit to certain participants. At that time, neither Hart nor John Hancock objected to the 1992 Amendment or expressed the view that it was invalid for any reason. Cullison also provided John Hancock with the text of the 1992 Amendment and requested that John Hancock prepare the necessary documents to incorporate it into the Plan Document.

On December 15, 1992, John Hancock transmitted to Cullison a Plan Document amendment which incorporated the changes requested in Cullison's December 1, 1992 letter. On December 21, 1992, Cullison signed the written amendment and transmitted an executed original of the 1992 Amendment to John Hancock. On or about January 6, 1993, John Hancock submitted the 1992 Amendment to the District of Columbia Insurance Commission for approval.

The adoption of the 1992 Amendment was consistent with the Plan's previous treatment of one other similarly situated employee. Walter Browne was an employee of PCD. He received past service credit in the Plan for his prior years of service with a union affiliated with PCD (and later MEBA/NMU), namely, FOPE. (It will be recalled that plaintiff Fisher was also a FOPE employee and Browne was her direct supervisor.) Browne became employed by FOPE on April 1, 1974, and in 1977 FOPE merged with PCD.

When FOPE merged with PCD, Browne was promised that he would receive pension service credit for the three and one half years that he had been employed by FOPE prior to the merger, and that neither FOPE nor Browne would bear the cost of that past service credit. On Janu-

---

6. It cannot reasonably be doubted that at the time of the hurried consideration of the 1992 Amendment in the fall of 1992, the members of the DEC knew about the on-going criminal investigation of the circumstances surrounding the merged union.

ary 17, 1984, Frank Laurito, then Administrator of the Plan, notified Browne that he was a participant in the Plan, with service credit retroactive to April 1, 1974. Thus, Browne received pension service credit for his three and one half years of prior service at FOPE, and neither Browne nor FOPE bore the cost of that past service credit. Prior to the merger between FOPE and PCD, FOPE was not an employer participating in the Plan.

Nevertheless, in due course; Hart, the Plan Administrator, acting unilaterally, refused to recognize the validity of the 1992 Amendment. In January 1993, sometime after Cullison had returned the signed 1992 Amendment to John Hancock, Hart contacted Charles Harootunian of John Hancock and—without the authorization of MEBA/NMU—demanded that the 1992 Amendment be ignored. Harootunian's handwritten memorandum of this conversation, prepared when he spoke to Hart, shows that Hart requested that the Amendment be rescinded because of "internal politics." *See* Plaintiffs' Summ. J.Memo.Ex 36 (Charles Harootunian Memorandum re: telephone conversation with Lucille Hart, January 1993). John Hancock, by letter dated January 26, 1993, notified the District of Columbia Insurance Commission that the 1992 Amendment should be deemed rescinded. An appreciation of the above-described acts by Hart is necessarily informed by an understanding of the legal landscape surrounding the merged union in early 1993. I set forth the following undisputed facts in my 1997 Memorandum Opinion in this case:

Within two months of [Hart's conversation with Harootunian], in March 1993, 12 former officers of both the pre-merger [PCD] and MEBA/NMU were indicted by a grand jury in the District of Columbia for a number of offenses, including election fraud related to the 1988 union merger. Thereafter, on June 29, 1993, a superseding indictment was filed charging 16 individuals, including both former and incumbent officers of MEBA/NMU as well as former officers of [PCD], with 10 counts of racketeering, fraud, embezzlement. These charges alleged, *inter alia,* that the elections of the officers were procured by fraud, that the merger of [PCD] with the NMU was procured by fraud, and that the nearly $2 million in "severance pay" the top elected officials of [PCD] paid to themselves constituted embezzlement. The record does not suggest, and the defendant has not asserted or intimated in any way, that any of the plaintiffs here were involved in criminal activity at any time.

After a trial ending in July 1995, seven of the defendants, including Cullison and former president DeFries, were convicted on all counts. *See United States v. DeFries,* 909 F.Supp. 13, 15 (D.D.C.1995) (ordering forfeitures under RICO in consequence of convictions). The remaining defendants plead guilty to various charges.

Shortly after the indictments were disclosed, on June 4, 1993, the various labor organizations affected by the merger entered into a so-called Interim Settlement Agreement ("ISA").

*Johannssen v. District No. 1—Pacific Coast District, MEBA Pension Plan,* No. AMD 96–2355, slip op. at 16–17, 1997 WL 580827 (D.Md. August 8, 1997). (The convictions of the seven union defendants were reversed on appeal for various technical reasons. *United States v. DeFries,* 129 F.3d 1293 (D.C.Cir.1997). Later, several of the defendants, including DeFries, entered guilty pleas to various counts. *See United States of America v. DeFries,* Case No. 93–Cr–117, Docket Nos. 772–75, (D.D.C. July 9, 1998) (DeFries guilty plea)).

Meanwhile, following Hart's telephone conversation with Harootunian, the Plan refused to implement the 1992 Amendment. The Plan first communicated this position to the plaintiffs in late 1993, when it sent each of them a statement itemizing his or her service credits in the Plan. These statements showed that plaintiffs had not received any credit for the years they were employed by, or were officers of, the organizations listed in the 1992 Amendment.

### C. Analysis of The 1992 Amendment's Validity and Enforceability

The Plan raises numerous arguments to support its contention that the 1992 Amendment is not valid, and that plaintiffs are not entitled to challenge the Plan's position.[7] As an initial matter, the Plan argues that the Amendment was invalid because the body enacting it, the DEC, lacked the power to amend the Plan document, or that it violated a fiduciary duty in enacting it because it was inadequately funded. Next, the Plan argues that the Amendment should be invalidated for equitable reasons because it was a product of union corruption. Finally, the Plan argues that it was proper for the Plan Administrator to disregard the Amendment, and in effect to rescind it, because of her belief that it was the product of union corruption and her belief that it was inadequately funded. I have carefully considered each of these arguments, but neither singly nor in the aggregate do they overcome the plaintiffs' showing that the DEC had the authority to effect the 1992 Amendment to the Plan, even with its generous award of past service credit to plaintiffs.

### 1. The DEC Validly Adopted the Resolution Amending the Plan Document

■ In accordance with 29 U.S.C. § 1102(b)(3), the Plan provides a "procedure for amending such plan," and for "identifying the persons who have authority to amend the plan." When a pension plan specifically identifies the employer as the person with the authority to amend the

---

7. Preliminarily, I find that plaintiffs have exhausted their administrative remedies. After receiving their 1993 pension statements, plaintiffs contacted the Plan Administrator to determine why they had not received additional service credit as the 1992 Amendment required. In response to plaintiffs' inquiries, the Plan Administrator notified Johannssen and Long, by letters dated October 4, 1994, that they were not entitled to additional service credit because the Plan was supposedly of the view that the 1992 Amendment "is not, and was not at any time, part of the Staff Plan." Plaintiffs' Summ.J.Memo.Exs. 37 & 38. Similarly, on March 30, 1994, the Plan Administrator notified Fisher that she was not entitled to additional service credit because FAPE "was not and is not a participating Employer in the Staff Plan...." *Id.* Ex 39. None of these letters advised plaintiffs that appeal procedures existed under the Plan or that plaintiffs had a right to appeal the Plan Administrator's decision.

After receiving these responses from the Plan, Johannssen and Long retained counsel and properly exhausted the Plan's internal remedies. The Plan's Answer concedes that both Johannssen and Long have "exhausted their administrative remedies with respect to the Staff Plan."

Although Fisher did not retain an attorney to file a claim with the Plan, she wrote to the Plan Administrator at least six times seeking an explanation of the Plan's refusal to provide the benefits to which she was entitled. The Plan Administrator, Hart, did not respond to Fisher's first three inquiries until nearly nine months later, when she denied Fisher's claim for benefits.

Despite Fisher's repeated written protests of Hart's decision, Hart concluded that Fisher was not entitled to past service credits and never informed Fisher that she was entitled to appeal her denial of benefits. When Fisher had finished her inquiries with the Plan, Hart had "fully and completely" considered her claim, unless more documents were available, which they were not. Thus, I conclude that Fisher also exhausted her administrative remedies.

plan, the employer is the only person with authority to amend the plan and no other persons are authorized to exercise amendment authority. *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 80, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). An employer is free under ERISA, for any reason at any time, to amend a pension benefit plan which the employer sponsors. *Lockheed Corp. v. Spink,* 517 U.S. 882, 883, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996).

■ In 1992, MEBA/NMU was the "Employer" under the Plan and had the right to amend the Plan by a written instrument executed by it so long as the amendment did not reduce a Plan participant's accrued or vested benefits in the Plan. Where, as here, the employer has the authority to amend a pension plan and the employer amends the plan through a resolution or vote of a board of directors (or, as in this case, the District Executive Committee), such an amendment is valid. *See Yenyo v. Communications Satellite Corp.,* 899 F.Supp. 1423, 1425 (D.Md.1995) (where plan document vested the employer with the authority to amend the plan and the employer's board of directors adopted the amendment, the amendment was valid); *Averhart v. U.S. WEST Mgmt. Pension Plan,* 46 F.3d 1480, 1489 (10th Cir. 1994) (where the pension plan expressly provides for amendments by the Employee Benefit Committee subject to approval of the board of directors, amendment was valid even though the board of directors did not pass a formal resolution authorizing the amendment); *Spacek v. Trustee of the Agreement of Trust for Maritime Assoc.–I.L.A. Pension Plan,* 923 F.Supp. 960, 962 (S.D.Tex.1996) (where plan document authorized the board of trustees to amend the plan, the amendment was valid even if the board did not comply with its own internal procedures in amending the plan), *rev'd on other grounds,* 134 F.3d 283 (5th Cir.1998). Thus, when MEBA/NMU's governing body, the DEC, approved the written resolution amending the terms of the Plan to grant pension credits to participants for past service with specific unions and their affiliates, and voted on October 20, 1992, to ratify the written resolution, the Amendment became binding on the Plan.

2. MEBA/NMU (Acting Through the DEC) Had Power in 1992 to Amend the Plan Document Without the Approval of the Affiliates

■ The Plan argues, largely on my prompting, that MEBA/NMU, acting alone, lacked the power to amend the Plan Document. Instead, the Plan contends that all of the affiliates of MEBA/NMU (roughly a half-dozen unions and other groups of employees) needed to approve any changes to the Plan Document. I am constrained to reject that argument for the following reasons.

Prior to the 1998 trial in this case, the Plan argued in its cross motion for summary judgment that the 1992 Amendment was invalid simply because PCD, instead of MEBA/NMU, had the power to act:

> Ms. Hart construed the provisions of the ... Plan to vest *sole authority* to amend the Plan in ... PCD, and not in the organization then known as MEBA/ NMU. Under the plain language of the ... Plan, ... Ms. Hart's determination was entirely reasonable.

Def.Cross Mot.Summ J.Memo. at 31 (emphasis added). In short, the Plan agreed that *one union* had the power to amend the Plan Document, and the only dispute was *which union.*

The Plan's current argument that "all must act" contradicts not only its own prior arguments in this case but the historical record as well. There have been many substantive changes to the Plan which occurred without the vote, concurrence or input of the affiliated unions whose employees participate in the Plan. Indeed, the

Plan conceded in answers to interrogatories that entities besides PCD, and later, MEBA/NMU "played essentially no role in the drafting, discussion, approval or disapproval of any amendment to the . . . Plan." Two examples are the 1991 and 1993 "informal" amendments to the Plan, which according to Hart were automatically adopted by the Plan merely because the Deep Sea Plan[8] had adopted them. Unlike the 1992 Amendment, these changes were adopted without so much as a vote of the governing body of the Plan's sponsor, MEBA/NMU. These amendments increased the cost to all employers participating in the Plan, but the amendments were adopted without the assent of, or even a vote by, MEBA/NMU's affiliates. None of the affiliated employers were represented on the Deep Sea Plan's board of trustees either, so the 1991 and 1993 amendments were without the affiliates' approval. Nevertheless, the amendments were indisputably valid.

Another example of a substantive change to the Plan absent approval of the affiliated unions is the Plan's decision in 1984 to award past service credit to Walter Browne. Browne received past service credit based on the instruction of PCD's then-President, Eugene DeFries. In Browne's case, there was not even a formal amendment to the Plan Document— but DeFries's action was nonetheless effective to confer three and one half years of past service credit on Browne without any payment of any kind. Hart conceded that if DeFries had directed the Plan to be amended to grant additional service credits to employees of PCD, then former Plan Administrator Frank Laurito would have had the authority to follow that instruction.

A third example of a substantive Plan change effected without affiliate approval is the DEC's action in 1988 to add employees of the pre-merger NMU as participants in the Plan, and to give them past service credit in the Plan for vesting and participation purposes. Once again, the authority of MEBA/NMU—acting alone— was recognized as sufficient to amend the Plan.[9]

8. The Deep Sea Plan, or the MEBA Pension Trust, was created, and is maintained, pursuant to collective bargaining agreements between PCD and various maritime employers, and covered the Licensed Division union members of those employers who were represented by PCD. The Deep Sea Plan, like the other MEBA Benefit Plans, is a jointly administered multi-employer plan, and is subject to the limitations of § 302 of the Labor Management Relations Act of 1947. The Plan at issue in this case was largely intended to mirror the Deep Sea Plan.

9. The Plan argues that the affiliated unions' approval was required to effect the 1992 Amendment because they would be required to pay for the benefits it incurred. This argument fails because, put simply, under the terms of the Plan Document, a valid amendment is a valid amendment notwithstanding funding considerations. In any event, the Amendment itself does not allocate funding; mechanisms exist to erect a fair allocation of costs. Specifically, if the cost of the 1992 Amendment should not fall on certain of the affiliates of the former MEBA/NMU, then the Plan can allocate that cost accordingly. Currently, the Plan is funded by PCD and its affiliates according to the number of employees/retirees and their years of service. In other words, if PCD has more employees in the Plan, or they have a greater number of service credits, PCD pays a higher proportion of the Plan's costs.

The Plan is free to allocate the cost of the 1992 Amendment to PCD and PASS, and not to the other unions whose employees are covered by the Plan. This was the procedure the Plan followed when another contributing employer (NATCA) was added to the Plan in 1990: the cost of the past service credit was allocated to NATCA in the ordinary course of the Plan's business. Upon enforcement of the 1992 Amendment, the Plan will carry out the same actuarial exercise with respect to PCD and PASS. The Plan may have to collect this money from PCD and PASS, but that hardly makes the 1992 Amendment invalid.

### 3. Equity Does Not Require or Permit Invalidation of the 1992 Amendment

 I reject the Plan's contention that fraud and wrongdoing in connection with the 1988 merger creating MEBA/NMU renders the 1992 Amendment invalid. The Plan urged at trial that the 1992 Amendment should not be enforced on theories of constructive trust and unjust enrichment, federal common law equitable theories. The Plan argued that "[a] primary purpose of ERISA is to 'protect . . . the interests of participants in employee benefits plans and their beneficiaries, . . . by establishing standards of conduct, responsibility, and obligations for fiduciaries.'" Plan Proposed Findings of Fact and Conclusions of Law p. 24, ¶ 16. This argument fails for two reasons. To begin with, the DEC, the body responsible for the 1992 Amendment, does not act as a fiduciary when amending the Plan. *Lockheed Corp. v. Spink*, 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996). In addition, as the Supreme Court explained in *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 259, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), "vague notions of a statute's basic purpose are nonetheless inadequate to overcome the words of its text regarding the specific issue under consideration." (Internal quotations omitted). Accordingly, general assertions that ERISA is meant to protect participant employee benefit plans will not override statutorily valid plan amendment authority.

 ERISA requires that pension plans be administered according to the terms of their written plan documents. 29 U.S.C. § 1102(a)(1). There is no authority under ERISA for me to disregard the plain meaning of a valid written amendment to a pension plan, based on equitable grounds. *See, e.g., Curtiss–Wright v. Schoonejongen*, 514 U.S. at 81–84, 115 S.Ct. 1223 (The ERISA scheme is "built around reliance on the face of written plan documents."); *HealthSouth Rehabilitation Hosp. v.*

*American Nat'l Red Cross*, 101 F.3d 1005, 1010 (4th Cir.1996), *cert. denied,* 520 U.S. 1264, 117 S.Ct. 2432, 138 L.Ed.2d 194 (1997); *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 58–59 (4th Cir.1992) ("use of estoppel principles to effect a modification of a written employee benefit plan would conflict with 'ERISA's emphatic preference for written agreements. . . . Equitable estoppel principles . . . have not been permitted to vary the written terms of a plan."), *cert. denied,* 506 U.S. 1081, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993). In this case, the Plan Document permitted MEBA/NMU to amend the Plan; therefore the 1992 Amendment should be enforced. Moreover, although there is a limited role for federal common law in the enforcement of ERISA, "[t]he authority of courts to develop a 'federal common law' under ERISA is not the authority to revise the text of the statute," *Mertens*, 508 U.S. at 258–60, 113 S.Ct. 2063, nor is "resort to federal common law" appropriate "when its application would . . . threaten to override the explicit terms of an established ERISA benefit plan." *Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1452 (4th Cir.1992).

Defendant's fraud argument also ignores the fact that MEBA/NMU, during the period 1988 to 1993, acted as a labor union and performed the functions which a labor union normally performs for its members. According to the "Interim Settlement Agreement," the union merger was terminated on June 4, 1993, and MEBA/NMU was then dissolved. I am unpersuaded by the evidence in the record that I should not enforce and give effect to the 1992 Amendment enacted by the DEC of the MEBA/NMU during the period of that union's existence.

In any event, there is no evidence that these plaintiffs participated in, were aware of, or knowingly supported, any of the

illegal acts which were committed in connection with the 1988 merger, or of severance pay paid out to DeFries and others. Nor is there any evidence that the 1992 Amendment was a "quid pro quo" for these plaintiffs' support for any illegal action by the MEBA/NMU union.[10] On the contrary, the evidence demonstrates, and I find, that the 1992 Amendment was the result of promises which had been made to plaintiffs beginning in 1976, in consideration for their faithful performance of union organizing and administration services.

4. The Plan Administrator Lacked the Authority to Rescind the 1992 Amendment

■ Hart's 1993 directive to John Hancock to ignore the 1992 Amendment was without legal effect because she had no authority to amend the Plan Document on her own, and she had no authority to disregard amendments lawfully enacted by the DEC. The Plan Document specifically states that the Plan Administrator, must act "for and on behalf of each Employer in any matter pertaining to this Contract...." Art. III, § 10. Thus, Hart was bound to act on behalf of MEBA/NMU and any action to the contrary was invalid and unauthorized because it constituted a breach of her fiduciary duty to the Employer. Moreover, as Article I, Section 20 of the Plan Document makes clear, *only the Employer* had authority to amend the Plan. The Plan Document did not give the Plan Administrator the authority or discretion to amend or rescind the Employer's amendments to the Plan. *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir.1996) (an employer may appoint a plan administrator but retain the right to amend the plan); *See Curtiss–Wright Corp.*, 514 U.S. at 83, 115 S.Ct. 1223 (plan

administrators are required to follow the plan document and to enforce every amendment actually adopted to the plan). Hart, as the mere agent of the Plan's sponsor, had no authority to amend or to rescind a valid amendment to the Plan.

It is true that plan administrators may have a statutory duty to sort out "from among the occasional corporate communications that pass through their offices and that conflict with the existing plan terms, the *bona fide* amendments from those that are not." *Curtiss–Wright Corp.*, 514 U.S. at 82, 115 S.Ct. 1223. However, the Plan's amendment procedure provides the administrator the mechanism for sorting. If the procedure was followed, the amendment is valid and must be adhered to. Plan administrators are required to follow the plan document and enforce every amendment actually adopted to a plan. *Id.* Here, the Plan amendment procedure was followed, the 1992 Amendment was therefore valid, so it must be enforced.

This conclusion also flows directly from the requirements of ERISA, which states that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). Because Hart had no authority or discretion under the Plan Document to amend or rescind amendments to the Plan, her efforts to do so had no legal effect. *See, e.g., Collins v. Seafarers Pension Trust*, 846 F.2d 936 (4th Cir.1988) (because trustees did not follow statutory procedure for amending plan to reduce accrued benefits, amendment was invalid).

The cases cited by the Plan do not support its argument that the Plan Administrator properly rescinded the 1992 Amendment, because none of them address a situation where a plan's *administrator*

---

**10.** Defendant has not suggested that the severance payments paid to Johannssen and Long were tainted in any way.

sought the right to veto an action taken by the plan's governing body. They are no authority for the Plan's claim that Hart had the power to rescind the 1992 Amendment if she thought it was too costly or was the product of a corrupt undertaking by union leaders acting without the knowledge of the intended beneficiaries. Instead, these cases reviewed claims by pensioners or their dependents that a plan's trustees or administrators had acted improperly by denying their claims for benefits.

For example, in *United Mine Workers of Am. Health & Retirement Funds v. Robinson,* 455 U.S. 562, 575, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982), a class of miners' widows challenged a provision in a collective bargaining agreement that denied them life-time health insurance, when another group of miners' widows would receive such benefits. The Supreme Court upheld the administrator's application of the collective-bargaining agreement, holding that a plan was not required to make "reasonable" distinctions among classes of potential beneficiaries, but that "because finite contributions must be allocated among potential beneficiaries, inevitably financial and actuarial considerations sometimes will provide the only justification for an eligibility condition [in a collective bargaining agreement] that discriminates between different classes of potential applicants for benefits." *Id.* at 575, 102 S.Ct. 1226.[11]

In *Whipp v. Seafarers Vacation Plan,* 832 F.2d 853 (4th Cir.1987), Whipp contested the eligibility criteria for obtaining vacation benefits which the plan's board of trustees had promulgated, as the plan document empowered them to do. Under these criteria, Whipp did not receive vacation benefits for one year, whereas he had obtained them on 18 other occasions. The Fourth Circuit held that while "any eligibility scheme which creates categories of time and service requirements is at least to a limited extent inherently arbitrary . . . .", the scheme denying vacation benefits unless a worker had worked 125 days in a 15 month period was within the trustees' power to establish, and was not an arbitrary and capricious exercise of that power. *Id.* at 856.

*Griffis v. Delta Family–Care Disability Plan,* 723 F.2d 822 (11th Cir.), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3514, 82 L.Ed.2d 823 (1984), likewise does not support the Plan's contention that the Administrator had the power to rescind a valid Plan amendment. In *Griffis,* the administrative committee of an ERISA plan refused to reinstitute benefits for a widow of a former employee covered under the plan when her second marriage was annulled. Under the plan, a widow's benefits were terminated upon her remarriage, and the committee decided that no reinstatement of benefits would occur if the second marriage were later annulled. The Eleventh Circuit held that this decision was not arbitrary and capricious and thus beyond the committee's proper authority, in part because the committee must forecast the plan's future obligations and the potential for multiple remarriages to be annulled would make such forecast difficult. Clearly, *Griffis* supplies no support for the argument that a plan administrator can disregard the terms of a plan document if she believes those terms are too costly.

Similarly, I must reject the Plan's reliance on *Winpisinger v. Aurora Corp. of Illinois,* 456 F.Supp. 559 (N.D.Ohio 1978).

11. The plan administrator in *Robinson* was merely carrying out the explicit terms of the collective bargaining agreement plan. The administrator was not exercising discretion to decide that the plaintiff class of widows would not receive benefits because it would be too costly. 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419.

That case actually supports plaintiffs' claim that Hart had no right or authority to rescind the 1992 Amendment. In *Winpisinger*, the pension plan's trustees adopted an amendment which canceled the past service credits to which the participants had previously been entitled. The court held that the retroactive cancellation was invalid because the trustees had breached their fiduciary duties to the plan's beneficiaries and had failed to act "solely in the interest of the participants and beneficiaries." Although the defendant trustees claimed their action was justified by an actuarial analysis of the past service credits, the court refused to sustain the cancellation on this basis. As the court held, the trustees "did not consider the question of actuarial soundness when deciding to adopt the amendment." They could not rely on such considerations to rescind it. *Winpisinger* thus holds that not even a plan's trustees who are empowered to amend a plan—let alone a plan administrator who reports to them—may divest beneficiaries of past service credit after it has been awarded, simply because the trustees suspect that the plan will one day need additional funding to pay for the past service credit.

Indeed, ERISA specifies a strict procedure for divesting beneficiaries of accrued benefits. When that procedure is not followed, the amendment purporting to enact the divestiture is invalid. *Collins*, 846 F.2d at 939. When the entity with authority to amend a plan believes an amendment is necessary that will diminish accrued benefits, in order to ensure that the plan complies with ERISA minimum funding requirements, the Secretary of Labor must be notified and given the opportunity to disapprove. The Secretary shall not approve such an amendment "unless he [sic] determines that such amendment is necessary because of substantial business hardship ... and that waiver under ... this title is unavailable or inadequate." *Id.*

(*citing* 29 U.S.C. § 1082(c)(8)). In other words, the Fourth Circuit has held, the Secretary will not approve a reduction in an accrued benefit through Plan amendment unless

> there would otherwise be an accumulated funding deficiency for all or part of the plan year in question, the funding deficiency could not be avoided through the implementation of any other reasonably available alternative (including amortization of experience losses or a waiver of the funding requirement), and the funding deficiency was not primarily attributable to the failure by employers to discharge contractual obligations to make contributions under the plan....

*Id.* at 940. Thus, when Hart directed that the 1992 Amendment be ignored, this had no legal effect, not only because the Plan Administrator had no authority on her own to amend the Plan, but also because she did not follow statutory procedure for divesting the plaintiff beneficiaries of the past service credits which the 1992 Amendment had awarded.

5. Inadequate Funding Is Not a Legally Sufficient Cause to Invalidate the 1992 Amendment

■ The Plan also argues that the 1992 Amendment is invalid because it was not adequately funded. Therefore, the Plan contends, in enacting it, the DEC violated its fiduciary duties and such a violation invalidates the amendment. However, MEBA/NMU—acting as sponsor of the Plan—had no fiduciary obligation to any person when it enacted the 1992 Amendment. "Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries." *Lockheed Corp. v. Spink*, 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996). When employers take those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust." *Id.* at 891, 116 S.Ct. 1783 (citations omit-

ted). "[T]he act of amending a pension plan does not trigger ERISA's fiduciary provisions." *Id.* Accordingly, MEBA/NMU, acting through the DEC, was not required to consider the cost of benefits when it amended the Plan.

In a variation on this argument, the Plan contends that Hart had the power to "rescind" the 1992 Amendment because its cost to the Plan was too great. However, as stated earlier, the Administrator is bound to enforce the written documents of a plan, including valid amendments. Concerns about cost do not empower the Administrator to reject amendments to the Plan Document. Concerns about the adequacy of plan funding are controlled by ERISA and the Contract itself (and thus the good judgment of the employer). ERISA establishes detailed "minimum funding standards" for employee pension plans. 29 U.S.C. § 1082. Moreover, the Contract mandates that "[t]he Employer will make contributions to the Plan in amounts which it determines, after consultation with the actuary for the Plan [and in compliance with ERISA], are necessary to maintain funding at a level sufficient to provide all benefits under the Plan as they become due." Plan Document § 19. It is telling that the Plan, and Hart, never relied on the ground that the Amendment was invalid because it was not adequately funded until suit was filed in 1996.

In any event, as explained below, there is adequate evidence that the 1992 Amendment was, or readily could have been and can be, adequately funded, through standard procedures. In the eight years since the 1992 Amendment was passed, the only Plan participants ever identified as eligible are the plaintiffs and another PASS employee named Abby Bernstein. Indeed, it is manifest that the 1992 Amendment was drafted with particular people in mind: the three plaintiffs and Bernstein. The Plan has never identified any additional participants who would qualify for past service credit under the 1992 Amendment.

In 1992, when Hart set out to calculate the cost to the Plan, the Plan's actuary, Frank Katz, told her that it would cost $33,900 per year to fund the benefits for Johannssen, Long and Bernstein. As to Fisher, Katz calculated the total present value of amending the Plan for her as between $102,000 and $220,000, depending on when she retired. The amortized yearly cost (spread over 30 years) would be even less.

The Plan now calculates that the 1992 Amendment would cost approximately $1.9 million. However, even this higher cost would not be a basis for finding a plan amendment unenforceable. In certain years, such as 1996, participating employers in the Plan have been required to pay as much as $900,000 in contributions. In addition, as explained earlier the Plan has discretion concerning the timing and amount of employee contributions.

The fact that earlier calculations in 1991 and 1992—completed by the Plan's same actuary, Katz—produced a figure almost two-thirds lower also undermines the credibility of the Plans' argument, even if it were relevant to enforcement of the 1992 Amendment. To the extent that the new higher estimates are based on new information and developments, subsequent to the 1992 Amendment, they are not relevant to the question whether it was enforceable, when adopted.

\* \* \* \* \* \*

For all of the reasons expressed herein, the DEC's approval of the 1992 Amendment to the Plan must be given effect. Hart erred in her unilateral decision to refuse to do so.

## III. THE PLAN ADMINISTRATOR ABUSED HIS DISCRETION

After trial on the issues of the validity and enforceability of the 1992 Amendment,

I issued an interlocutory order declaring that the 1992 Amendment was valid as of its date of enactment, October 20, 1992. Accordingly, I remanded the case and directed the then Plan Administrator to apply the Amendment to determine the amount of service to be credited to each of the plaintiffs.

The Plan Administrator, Allen Szymczak, made the following findings. Johanssen was determined to be entitled to only 12 years past service credit (and not the 21 years he had requested); Long was determined to be entitled to only 12 years (rather than the 23 years he had requested); and Fisher was not entitled to any past service credit (when she had requested eight years credit). Past credit for Johanssen and Long was denied for the years they worked at the FAA because they participated in the federal pension system while employed there. In addition, their years as officers of affiliated unions were not credited because they were not paid as officers and therefore did not prove that they were paid for 1,000 hours of union work. Fisher was determined to be entitled to no past service credits because she had not proved she had worked 1,000 hours for the union during any one of the eight years for which she requested credit.

In making these determinations, the plaintiffs contend in their motion for summary judgment, Szymczak abused his discretion. Defendant counters in its cross-motion for summary judgment that the Plan Administrator's determinations should be sustained. As explained below, I am persuaded, as a matter of law, that Szymczak abused his discretion and that each of the plaintiffs is entitled to past service credit as specified herein.

### A. Summary Judgment Standard

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to

trial. *See Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987).

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991); *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n. 3 (4th Cir.1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985).

The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.*, 627 F.Supp. 170, 172 (D.Md. 1985) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* 2d § 2720). *See also Federal Sav. & Loan Ins. Corp. v. Heidrick*, 774 F.Supp. 352, 356 (D.Md.1991), *aff'd sub nom. FDIC v. Am. Cas. Co. of Reading, Pa.*, 983 F.2d 1055 (4th Cir.1993). "[C]ross-motions for summary judgment do not automatically empower the court to dispense with the determination whether questions of material fact exist." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir.), *cert. denied*, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw a reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir.1987). Both motions may be denied. *See Shook v. United States*, 713 F.2d 662, 665 (11th Cir.1983).

"[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil & Gas, Inc. v. Appleman*, 380 F.2d 323, 325 (10th Cir.1967). *See also McKenzie v. Sawyer*, 684 F.2d 62, 68 n. 3 (D.C.Cir.1982) ("neither party waives the right to a full trial on the merits by filing its own motion"). However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook*, 713 F.2d at 665.

B. Standard of Review

When an employee benefit plan confers discretion upon an administrator to determine eligibility for benefits, as the Plan at issue here does, the Fourth Circuit has instructed that the standard of review to be applied to the administrator's benefits decision is (1) to decide *de novo* whether the administrator acted within the *scope* of that discretion; and (2) if the administrator's decision is within the scope of the discretion conferred by the plan, review the merits for an abuse of discretion. *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir.2000); *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir.1996). The Plan specifies "the Plan Administrator shall have exclusive right to interpret the Plan and to decide any matters arising thereunder in connection with the administration of the Plan." The Plan Document § 15. When denying claims, the Plan Document: specifies, "the Plan Administrator ... shall provide ... a written statement setting forth specific reasons for the denial...." *Id.* § 17. It is evident from these provisions that Szymczak acted within the scope of his authority when he applied the 1992 Amendment to

determine what past service credit should accrue to the plaintiffs. .

Plaintiffs argue that while Szymczak had the power under the Plan Document to make these determinations, in fact he did not exercise any discretion and deferred all judgment to the Plan's legal counsel. They argue, therefore, that the Administrator's determinations should be reviewed *de novo* because he failed to exercise any discretion. As explained below, given the degree to which Szymczak deferred to defense counsel in deciding which documents to review and in making his determinations, this is a close question. However, I am persuaded that he exercised his discretion in these determinations, as clouded as they may have been by defense counsel's adversarial posture toward plaintiffs. Thus, the sole issue before me is whether he abused his discretion in making those determinations.

▆▆ In *Booth v. Wal–Mart Stores, Inc.,* 201 F.3d 335. (4th Cir.2000), the Fourth Circuit delineated eight non-exclusive factors that a court may consider to determine the reasonableness of a fiduciary's discretionary benefits decision under ERISA:

(1) the language of the plan;

(2) the purposes and goals of the plan;

(3) the adequacy of the materials considered to make the decision and the degree to which they support it;

(4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan;

(5) whether the decisionmaking process was reasoned and principled;

(6) whether the decision was consistent with the procedural and substantive requirements of ERISA;

(7) any external standard relevant to the exercise of discretion; and

(8) the fiduciary's motives and any conflict of interest it may have.

201 F.3d at 342–43.

▆▆ It is important to note that in weighing these factors, "[a] fiduciary's conflict of interest, in addition to serving as a factor in the reasonableness inquiry, may operate to reduce the deference given to a discretionary decision of that fiduciary." *Id.* at 343 n. 2. In other words, "a court, presented with a fiduciary's conflict of interest, may lessen the deference given to the fiduciary's discretionary decision to the extent necessary to 'neutralize any untoward influence resulting from that conflict.'" *Id.* (*quoting Doe v. Group Hospitalization & Med. Services,* 3 F.3d 80, 87 (4th Cir.1993)).

C. Analysis

▆▆ The record demonstrates that Plan Administrator Szymczak, was seized of several interests which conflicted with his neutral application of the 1992 Amendment. First, while purporting to accept this court's direction to consider the 1992 Amendment valid and to apply it neutrally, he espoused the Plan's position that the Amendment was invalid, and that its purpose was to "continue the criminal activities of the [union officials] that were in place at that time." Def. Cross Mot. Summ.J.Memo.Ex. G, at 186 (Deposition of Allen Szymczak) (hereinafter "Szymczak Depo."). Moreover, it is clear that Szymczak viewed his determination of past service credit under the 1992 Amendment, pursuant to this court's order, as an arm of the on-going litigation between the Plan and the plaintiffs, and by extension, between the PCD and the admittedly corrupt leadership of the former merged union, MEBA/MNU. In Szymczak's determination letter of November 19, 1999, informing plaintiffs that they were not entitled to the full past service credit they requested, he explained that past credit would be

denied in part based upon the distinction between the two warring unions, MEBA/NMU and PCD. The letter noted that this distinction "is central to this litigation," as if the past credit benefits determination itself was also part of "this litigation." Plaintiffs are entitled to a neutral application of the Amendment; not one carried out by an adjunct of the adversarial defense team in this litigation.[12]

The degree to which Szymczak relied upon defense counsel in making his determination of past credit reinforces this point. He apparently reviewed only those documents which the defense team called to his attention, because "it would have been impossible for me to go through every page individually." *Id.* at 201. Thus, he was familiar with that part of Michael Derby's, General Counsel to MEBA/NMU, deposition testimony which explained that the proviso clause at the end of the Amendment was intended to prevent double dipping, (receiving pension payments from more than one plan for the same time period of work), but he was unfamiliar with the portions of that deposition explaining that the purpose of the amendment was to ensure that plaintiffs obtain past service credit for their time working as officers of various affiliate unions.

Moreover, the Plan claims that Szymczak was not influenced by a financial conflict of interest, arguing that Johannssen and Long's past service credit would most likely be paid by their former employer PASS, and not by PCD, the entity which appointed Szymczak as Administrator of the Plan. However, it is noteworthy that while these two plaintiffs were accorded twelve years each of past service credit, Fisher, whose pension credit the Plan admits would be paid by PCD, was accorded no past service credit. Thus, because of these apparent conflicts, there is reason to accord the Administrator's determinations in plaintiffs' cases less deference than would otherwise be appropriate.

I turn now to consider the Administrator's determinations in light of the factors delineated in *Booth.* Szymczak applied the 1992 Amendment to determine that Johannssen was entitled to 12 years additional past service credit (out of 21 sought), Long was entitled to 12 years additional past service credit (out of 23 years sought), and Fisher was entitled to no additional credit (out of eight years sought). Szymczak denied years of requested past service credit for a series of overlapping reasons.[13]

---

12. The Plan could have referred the determination of past credit under the 1992 Amendment to independent counsel in order to avoid this conflict. *See Copeland v. Carpenters Dist. Council of Houston and Vicinity Pension Fund,* 771 F.Supp. 807, 809 (E.D.Tex.1991).

13. In addition to the reasons analyzed herein, Szymczak denied Long service credit for an unspecified portion of the period from 1969 through 1970 when he held union positions which Szymczak determined did not qualify as "officer" under the Amendment (e.g., Executive Board of PATCO Local, Sector Representative, Chairman of the PATCO Southern Region Organizing Committee.) "Officer" is not a defined term in the 1992 Amendment. However, Long is entitled to service credit under subsection (iv) of the Amendment for

the time period 1969 through 1970 because he was then an employee of the FAA which had a collective bargaining agreement with PATCO, an affiliate of the direct predecessor of MEBA/NMU.

Likewise, Szymczak denied Fisher service credit for the portion of her time between 1973 and 1980 when she was "steward" for FAPE because he determined that "steward" did not qualify under the 1992 Amendment as an "officer" of the union. However, Fisher's trial testimony made clear that she was a steward only in 1972 which was outside the time period for which she claimed service credit. Thus, I do not need to resolve the issue of whether Szymczak abused his discretion in his interpretation of the term "officer."

First, Szymczak read the Amendment proviso to eliminate any years during which a plaintiff had ever vested pension credits, even if the plaintiff never received any benefit and was not entitled to any benefit. This reading of the proviso effectively eliminated Johannssen and Long's claim for pension credit for the nine years they each worked at the FAA. In addition, Szymczak refused to accord past service credit for Johannssen and Long's FAA service, or for Fisher's Boeing service, because the Amendment specified that such past service credit should be accorded for service with a "contracted employer of District No. 1—MEBA/NMU or one of its affiliates." He determined that the FAA and Boeing were contract employers with PCD, the predecessor union to District No. 1—MEBA/NMU, and thus the plaintiffs' time working for these employers did not qualify under the Amendment. Finally, Szymczak imposed a "1,000 hours" paid service rule to eliminate any years of past service credit in which a plaintiff was not employed by a covered entity for at least 1,000 hours at minimum wage. Under this interpretation, Fisher was entitled to no past service credit. I am constrained to reject Szymczak's reasoning in all of these regards for the reasons set forth herein.

## 1. The Language of the Plan

The first *Booth* factor directs me to review the Administrator's exercise of discretion in light of the "the language of the plan," which would include the 1992 Amendment to the Plan Document. Szymczak's interpretation of the Amendment disregarded the clear meaning of common words and rendered key parts of it entirely meaningless in a clear abuse of his discretion.

Plaintiffs had each served as officers of unions as diverse as PATCO, FAPE (a subordinate body of POID), and AFGE. With few exceptions, this service was unpaid. In all cases, the plaintiffs have no present pension coverage for this service. The 1992 Amendment was intended to address this problem by granting service credit for each year "as an employee or officer" of these three unions. Szymczak decided that in order to obtain past service credit as an "officer," one would have to satisfy the requirement applicable to service credit for "employees" that one had to have been paid for at least 1,000 hours in order to obtain credit for any year of employment.[14] He imposed this requirement, though "officer" is nowhere mentioned in the unamended Plan Document, and the Amendment contained no such requirement. He imposed this requirement, even though he acknowledged at deposition the addition of the requirement of payment effectively nullified the Amendment term "officer." Szymczak Depo. at 220–21. If one were paid by the union for 1,000 hours or more, one would already be entitled to service credit as an "employee." However, if one worked as an unpaid officer, as these unions' officers commonly worked during the relevant time period, the Amendment did not apply. A Plan Administrator is not empowered to delete key terms from a plan's language. Because Szymczak's interpretation effectively deleted the key term "officer" from the Amendment, it was an abuse of discretion.

Similarly, Szymczak's interpretation of the 1992 Amendment proviso disregarded the clear meaning of the word "benefit" and constituted an abuse of discretion. The proviso stated that service credit

---

**14.** Even as to employees, as opposed to officers, this requirement only applied to work performed after 1976. However, because Szymczak reviewed the Plan Document in effect in 1996, not the one in effect in 1992, he applied this 1,000 hours requirement to deny Johannssen and Long credit for years prior to 1976.

would be granted under certain circumstances, "provided that the participant has not received service credit with respect to any other pension plan in which the participant is entitled to an accrued benefit." Szymczak's November 19, 1999 determination letter explains that the proviso means that if a participant "accrued a vested benefit in another plan for the same period of time for which he or she is seeking credit under the 1992 Amendment, he or she cannot receive credit from the Staff Plan for that same period of time." Plaintiffs' Summ.J.Memo.Ex. 2, at 4. On this basis, credit was denied to Johannssen for the period April 1968 to March 1977, and to Long for the period March 1967 to December 1976, when each worked at the FAA and participated in the CSRS. However, when each left the FAA, he had not accrued any vested pension benefit and each merely withdrew the employee contribution portion of his account, thereby forfeiting any right to the employer contribution. Each paid income tax on this money. I agree with Szymczak that had Long or Johannssen received a vested pension benefit at the time they left the FAA, they would not have qualified for past service credit under the 1992 Amendment for those FAA years. However, they did not receive any "pension benefit," they only received their "deferred" salary. Manifestly, it was an abuse of discretion to interpret the 1992 Amendment term "benefit" to exclude credit for the FAA years.

The 1992 Amendment granted credit for service as an employee or officer of POID and AFGE, and for service with a contracted employer of MEBA/NMU or one of its affiliates. However, Szymczak's interpretation of the Amendment rendered these provisions meaningless, as he acknowledged his application would result in no one obtaining any past service credit based on them. Szymczak acknowledged that Johannssen was the only Plan participant who was an AFGE officer and that

this clause "applies to Johannssen, ... that is clear." Szymczak Depo. at 208. However, he denied any service credit under this provision because he read into the Amendment the requirement of 1,000 hours paid service. Szymczak also acknowledged that Fisher was an officer of FAPE, which was a subordinate body of POID, at least for an unspecified portion of the time she claimed. Nevertheless, he denied her credit under this provision because of his "1,000 hour paid service" rule. Indeed, Szymczak acknowledged that no one would receive any credit under these provisions. He had effectively nullified them.

Szymczak's application of the 1992 Amendment effectively nullified the MEBA/NMU clause as well. His handwritten annotation of the 1992 Amendment notes that because MEBA/NMU did not exist until the union merger in 1988, this clause "eliminates pre 4/1/88 service. Didn't pay attention to detail." Plaintiffs' Summ.J.Memo.Ex. 17. Szymczak refused to interpret the clause "service with a contracted employer of MEBA/NMU or one of its affiliates" to refer to the current union and its predecessors, as the drafters of the 1992 Amendment clearly intended it would. Rather, he interpreted it to refer only to contracted employers of the merged union entity, despite acknowledging that no one would obtain service credit under this interpretation, and despite his notation indicating that he realized the drafters had made a scrivener's error. The Plan's adherence to a strict constructionist interpretation of Plan language, in the face of knowledge of scrivener's error and in the face of knowledge that such a strict interpretation violated the drafter's intent and rendered key provisions of the Amendment meaningless, is clearly an abuse of discretion.

## 2. The Purpose and Goals of the Plan

Turning now to the second *Booth* factor, I must consider whether Szymczak exercised his discretion consistent with "the purposes and goals of the plan." 201 F.3d at 342–43. Szymczak correctly stated that his goal in interpreting the 1992 Amendment should be to determine the "objective of the 1992 Amendment," the "purpose of the language," and what that language "was designed to do." Szymczak Depo. at 35–36. Moreover, Szymczak had available definitive evidence concerning the intent of the drafters of the 1992 Amendment, that is the intent of the DEC of MEBA/NMU. Szymczak recognized this source of evidence of intent for he relied heavily, though selectively, upon it, in interpreting the 1992 Amendment. That source was Michael Derby, the General Counsel and assistant to the president of MEBA/NMU in 1992, who assisted in drafting the 1992 Amendment and its proviso, and whose handwriting appears on one version of the proviso. Szymczak's November 19, 1999, determination letter quoted and attached Derby's 1996 deposition transcript to support the contention that the proviso was intended to prevent "double-dipping." Plaintiff's Summ.J.Memo.Ex. 2, at 4. In addition, the July 1, 1999, letters each stated that the proviso would be interpreted "in harmony with the testimony as to the reason why the clause was included in the 1992 Amendment, as explained by Mr. Derby." *Id.* Indeed, Derby's deposition was the only deposition cited by Szymczak in his determination letters.

However, Szymczak claimed to have been ignorant of memoranda authored by Derby which were attached to his deposition transcript which definitively indicated that the 1992 Amendment was intended to grant Johannssen 21, Long 23 and Fisher eight years past service credit. Notably, Szymczak testified repeatedly that despite recognizing Derby as a definitive source

concerning the intent and goals of the 1992 Amendment, Derby's beliefs about the years of coverage it intended to bestow upon the plaintiffs "would not have influenced my decision" to grant them considerably less credit. Szymczak Depo. at 212–13.

That Szymczak's application of the 1992 Amendment is fatally inconsistent with its "goals and purposes" is obvious when considered in light of at least four contemporaneous statements Derby made before and shortly after adoption of the 1992 Amendment. Three of those statements were contained in memoranda attached as exhibits to the same Derby deposition transcript which Szymczak quoted in his determination letters.

Specifically, these statements included a memorandum Derby sent to Lou Parise, a member of the DEC, attaching a draft of the 1992 Amendment on September 28, 1992, shortly before its passage. The memo stated that the resolution was meant "to grant past service credit to certain PASS Division employees and the assistant director of the Federation of Public Employees." Johannssen and Long each worked for PASS, and Fisher was the assistant director of FAPE, at that time. On January 8, 1993, Derby sent a memo regarding the 1992 Amendment to an attorney named George Capiello. Plaintiffs' Summ.J.Memo.Ex. 11. The memo identified the three plaintiffs and Abby Bernstein, another PASS employee, and stated that each was to be covered pursuant to the terms of the Amendment. Derby explained that pursuant to the 1992 Amendment Donna Fisher was to receive pension credit "from 1973 forward .... Howard Johannssen ... from April 1968 forward ... Marvin Long ... from 1968 forward." Plaintiffs' Summ.J.Memo.Ex. 11. Szymczak testified that he did not know about Derby's assessment and that he had not

reviewed this memo, though it was attached to the Derby deposition transcript. Szymczak Depo. at 209–11.

A third Derby document was attached to the deposition transcript of Fisher. Dated March 26, 1993, it was a letter from Derby to Fisher requesting information about her past service "so that we could begin the process of determining the cost of the additional past service for all of the affected employees." Plaintiffs' Summ.J Memo. Ex. 12. Again, in deposition Szymczak stated that he did not recall seeing this letter but that, if he had, it would not have affected his interpretation that the 1992 Amendment did not cover Fisher at all. Szymczak Depo. at 207–08.

A memo Derby sent to Johannssen on October 27, 1993, enclosed documents which Derby had sent to the then Plan Administrator, Lucille Hart, "including a list of the employees covered by the amendment on past service credits." Plaintiffs' Summ.J.Memo.Ex. 13. Among the enclosures was Derby's January 8, 1993, memo listing the number of years each plaintiff would receive in past credit.

Not only was Szymczak's determination of past service credit at odds with what his principal contemporaneous source stated was the intent of the 1992 Amendment, it was also contrary to what the Plan itself at one point stated was the "sole purpose" of the Amendment: to grant past service credit to the plaintiffs. Understandably, the Plan asserted this to argue that the Amendment was an invalid reward to plaintiffs for alleged (and unsubstantiated) corrupt activities; however, it is clearly against the weight of the historical record to now claim that the purpose of the 1992 Amendment was other than to accord past service credit to the plaintiffs, and also perhaps to Abby Bernstein. Thus, I am compelled to conclude that Szymczak's interpretation of the 1992 Amendment was contrary to the "purposes and goals of the plan."

### 3. The Adequacy of Materials Considered

The third *Booth* factor requires an evaluation of "the adequacy of the materials considered to make the decision and the degree to which they support it." 201 F.3d at 342–43. Clearly, Szymczak's professed ignorance of the critical Derby documents described above reflects the inadequacy of the record he considered. In addition, when Szymczak analyzed the 1992 Amendment, he looked at the wrong plan document altogether. Although I instructed him to proceed on the basis that the 1992 Amendment was valid as of its adoption in October 1992, Szymczak relied upon the 1996 plan document, not the 1992 Plan Document, though he later acknowledged that he was in error. Szymczak Depo. at 43–44. As of the date of his deposition, he was not sure how the 1992 Plan Document differed from the 1996 plan document because he "didn't read it word for word." *Id.* at 43–44. Szymczak explained that the 1996 plan document did not define the term "service" and so he was forced to look to definitions of "Hours of Service" and "Years of Service" in the 1996 plan document to determine that one could not receive past service credit for unpaid work.

However, under the 1992 Plan Document, "service" was a defined term, and employees were entitled to past service credit for unpaid work performed prior to January 1, 1976. Accordingly, even under the erroneous interpretation that "officers," as well as mere "employees," must satisfy the 1,000 hour paid work rule, the seven years that Johannssen and Long each worked as unpaid union officials prior to 1976 would have been credited, had Szymczak analyzed the applicable Plan

Document. While these are only the most egregious examples of a litany of inadequacies in the record Szymczak considered, they are enough to warrant the conclusion that the materials he relied upon were inadequate and did not support the argument that his determination was reasonably derived based on an adequate review of relevant documents.

4. Consistency

The fourth *Booth* factor requires examination of "whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan." 201 F.3d at 342–43. Szymczak's refusal to read the MEBA/NMU clause to grant past service credit for work with a contracted employer of MEBA/NMU *or its predecessors* is flatly inconsistent with prior and subsequent interpretations of the Plan. For example, during the existence of MEBA/NMU, the Plan was defined as "the District No. 1–PCD MEBA Pension Plan," Plaintiff Summ.J.Memo.Ex. 16, at 1–1. It also bore a signature block for the same (then nonexistent) union. However, Szymczak admitted that despite these facts, he would have known that employees of MEBA/NMU were entitled to participate in the Plan, Szymczak Depo. at 227–30, and indeed these employees did obtain service credit in the Plan during the years 1988–1993 when the merged union existed.

Likewise, for at least several months after the merger was rescinded in 1993, the definition of "Employer" for the Plan continued to be MEBA/NMU, but this was not cause for denying service credit to employees of the now independent PCD. Indeed, Plan Administrator Hart wrote a letter to the Plan's attorney dated January 5, 1994, pointing out that the definition of "Employer" had inadvertently not been changed to reflect the dissolution of the merger. Hart requested that it "should be corrected when the Plan is next amended."

Hart clearly did not feel any urgency about changing the definition, and she did not feel bound to deny service credit to PCD employees for the months when the definition was incorrect. The Plan's sudden adherence to a strict constructionist interpretation of the Plan is blatantly inconsistent with its past interpretations, particularly regarding scrivener's errors concerning union name changes.

5. Quality of the Decision-making Process

The fifth *Booth* factor requires examination of "whether the decisionmaking process was reasoned and principled." 201 F.3d at 342–43. Given the lack of adequate underlying record, Szymczak's disregard for key words of the Amendment, and his apparent lack of concern for the drafters' intent, I can only conclude that denying or greatly reducing the plaintiffs' past service credit requests was a foregone conclusion heavily influenced by adversarial defense counsel. As such, the result is neither "reasoned" nor "principled."

6. Remaining Factors

As to the remaining *Booth* factors, aside from its disregard for the intent of the framers of the 1992 Amendment, and its nullification of several of the Amendment's key terms, Szymczak's determination was consistent with the procedural and substantive requirements of ERISA. Given the strength of the findings of abuse of discretion, there is no need to consider "any external standard relevant to the exercise of discretion"; moreover, "the fiduciary's motives and any conflict of interest it may have" have been amply covered above. 201 F.3d at 342–43.

D. No Remand is Necessary

For the reasons explained above, I am persuaded that Szymczak abused his dis-

cretion in his application of the 1992 Amendment to the undisputed facts of record when he greatly reduced the past service credit of Johannssen and Long, and denied it entirely to Fisher. Moreover, because a full and undisputed factual record is now before this court, I decline to remand the case to the Administrator, and instead, turn to apply those facts to the 1992 Amendment. As the Fourth Circuit has explained:

> Normally, where the plan administrator has failed to comply with ERISA's procedural guidelines [or has not considered key evidence].... the proper course of action for the court is remand to the plan administrator for a 'full and fair review.' However, a remand for further action is unnecessary [where] ... the evidence clearly shows that the Plan Administrator abused his discretion.

*Weaver v. Phoenix Home Life Mutual Insurance Company,* 990 F.2d 154, 159 (4th Cir.1993). As was true in *Weaver,* "all the needed evidence is before the court, and we dispense with remanding the case to the plan administrator and hold that ... the evidence clearly demonstrates no material question of fact and the [claimants] are entitled to judgment as a matter of law." *Id.* Moreover, having once remanded the determination of the application of the Amendment to Szymczak, it would incur unnecessary delay to an already unnecessarily lengthy proceeding to remand again. Clearly, the 1992 Amendment was intended to accord past service credit to plaintiffs. It is time that they receive it.

As a matter of law, Johannssen is entitled to 21 years of additional past service credit for the period April 1968 through 1989 for partially overlapping reasons. He obtains nine years of credit under subsection (iv) of the 1992 Amendment for the period April 1968 through February 1977 for his years of service at the FAA. The FAA was under contract with PATCO during that period, and PATCO was an affiliate of the direct predecessor of MEBA/NMU. Johannssen is also entitled to credit for seven years of service under subsection (v) of the Amendment for the period July 1969 to September 1976 because, while he was employed by the FAA, he served as an officer of AFGE Local 3341, a subordinate body of AFGE. He obtains 12 years of past service credit for the period 1977 through 1989 under subsection (i) of the Amendment because he was employed by and was an officer of PASS.

As a matter of law, Long is entitled to a total of 23 years past service credit for the period March 1967 through 1990 for the following, partially overlapping reasons. Long is entitled to nine years of past service credit under subsection (iv) of the Amendment for the period of March 1967 through December 1976 because he was employed by the FAA which had a collective bargaining agreement with PATCO, an affiliate of the direct predecessor of MEBA/NMU. He is also entitled to five years past service credit under subsection (ii) of the Amendment for the years 1971 to 1976 while he was employed at the FAA, because he was an officer of various PATCO locals and a PATCO branch. Long is entitled to seven years past service credit under subsection (ii) of the 1992 Amendment for the period January 1977 through December 1983 because he was employed by PATCO. Long is entitled to six years of past service credit under subsection (i) of the 1992 Amendment for the period January 1984 through 1990 when he was employed by PASS.

As a matter of law, Fisher is entitled to seven and a half years additional past service credit under subsection (iii) of the Amendment for the years April 1973 to August 1980 when she served as an officer of FAPE, which was a subordinate body of POID. She would also be entitled to past

service credit for this time under subsection (iv) of the Amendment because she was employed full time by Boeing and Boeing Services International, both of which had collective bargaining agreements with FAPE, an affiliate of the direct predecessor of MEBA/NMU, the PDC.

As a matter of law, plaintiffs would have acted consistent with their own best interests and requested and received a "lump sum" payment of their pensions if the 1992 Amendment had been enforced according to its terms. In the case of Johanssen and Long, that request for a lump sum would have been made no later than April 1994, when each individual terminated his employment with the PASS union. Such a lump sum would have been requested no later than September 1993 in the case of Fisher, who would have reached a total of twenty years of service under the terms of the 1992 Amendment at that time. Accordingly, a lump sum payment would have been due and payable to Johanssen and Long in April 1996, and to Fisher in September 1995. This is because the Plan Document requires at least two years lead time before a lump sum request may be processed.

■ I am persuaded that an award of prejudgment interest for each plaintiff is appropriate. This is because the Plan's refusal to recognize the validity of the 1992 Amendment has caused plaintiffs to lose the benefit of their lump sum payments for a period of several years, and because only an award of prejudgment interest can make these plaintiffs whole. *See, e.g., Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017 (4th Cir.1993); *Lutheran Med. Ctr. of Omaha, Neb. v. Contractors, Laborers, Teamsters, & Eng'rs Health & Welfare Plan,* 25 F.3d 616 (8th Cir.1994); *Norman v. Holland,* 962 F.Supp. 843 (S.D.W.Va.1996), *aff'd,* 131 F.3d 135 (4th Cir.1997). Prejudgment interest at the federal statutory rate will be calculated

pursuant to 28 U.S.C. § 1961(a). *See Cottrill v. Sparrow, Johnson & Ursillo, Inc.,* 100 F.3d 220 (1st Cir.1996). Prejudgment interest will be calculated on the amount which plaintiffs would have received upon payment of a lump sum in September 1995 and April 1996, respectively, and the Plan will be directed to calculate that amount so that prejudgment interest may be awarded on it.

## IV. CONCLUSION

For the reasons stated above, I find the 1992 Amendment to the Plan was valid and enforceable as of its enactment on October 20, 1992. Furthermore, I am persuaded that, as a matter of law, the Plan Administrator abused his discretion in his application of the 1992 Amendment to determine plaintiffs' past service credits. Accordingly, I shall grant plaintiffs' motion for summary judgment on this issue and deny the Plan's cross-motion for summary judgment. Because there is no dispute of material fact as to the correct application of the 1992 Amendment to plaintiffs, I shall enter an order providing as follows: that plaintiff Johanssen is entitled to 21 years and plaintiff Long is entitled to 23 years of service credit; plaintiff Fisher is entitled to seven and one half years of service credit. Moreover, in order to place plaintiffs in the same position in which they would have been if the 1992 Amendment had been honored on its effective date (with an opportunity to exercise their rights under the Plan Document as amended, on the effective date of the 1992 Amendment), defendant shall be ordered to calculate the lump sum payment which plaintiffs would have received on the above-referenced dates and pay it (together with pre-judgment interest) to plaintiffs.